307 Ga. 79
FINAL COPY

S19A0682. ANDERSON v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Leonardo Anderson was convicted of felony murder, aggravated assault, and a firearm offense in connection with the shooting death of Arkeen Abron and the non-fatal shooting of Showkey Barnes. Appellant argues that the trial court erred by admitting into evidence lead detective Jonathan Puhala's video-recorded interview of Appellant's girlfriend and failing to grant a mistrial after one of her statements in the interview was played for the jury; by excluding evidence of Barnes's more-than-ten-year-old criminal convictions under OCGA § 24-6-609 (b); by excluding evidence of a firearm found at the house where Abron and Barnes's associate James Walker was staying; by allowing Detective Puhala to stay in the courtroom during the trial; and by declining to give a jury instruction on voluntary manslaughter. Having reviewed the

record and briefs, we see no reversible error, so we affirm.[1]

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. On the afternoon of July 18, 2014, Abron and Walker picked up Barnes in a Silverado truck. With Barnes in the passenger's seat and Walker in the back seat, Abron drove to 1206 Seiler Avenue in Savannah to ask someone there for the phone number of a marijuana dealer. When they arrived, Barnes got out and walked onto the porch, where

---

[1] The crimes occurred on July 18, 2014. On September 3, 2014, a Chatham County grand jury indicted Appellant for malice murder, felony murder based on aggravated assault, three counts of aggravated assault (against Abron, Barnes, and Walker), possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony. The count for possession of a firearm by a convicted felon was bifurcated, and Appellant was tried on the other charges from June 15 to 19, 2015. The jury found him not guilty of malice murder and aggravated assault of Walker, but guilty of felony murder, aggravated assault of Abron and Barnes, and possession of a firearm during the commission of a felony. The bifurcated firearm charge was then nolle prossed. The trial court merged the count for aggravated assault of Abron into the felony murder conviction and sentenced Appellant to serve life in prison without the possibility of parole for felony murder, 20 consecutive years for aggravated assault of Barnes, and five consecutive years for possession of a firearm during the commission of a felony. Appellant filed a timely motion for new trial, which he later amended. The parties waived a hearing, and the trial court denied the motion on August 26, 2016. Appellant then filed a timely notice of appeal, and the case was docketed to the April 2019 term of this Court and submitted for decision on the briefs.

he began talking to some people. Appellant approached Barnes, mumbling "in an aggressive way." Barnes became nervous when people on the porch began discussing a mask. Barnes walked off the porch, but Appellant followed him, continuing to talk.[2] Appellant then went to a white van, retrieved a gun, turned around, and shot at Barnes, hitting him in the legs eight times. Barnes fell to the ground and passed out, but he survived.

Abron started the Silverado and tried to drive away, but backed into a car. Appellant turned and shot at the truck; one shot hit the windshield. Walker ducked down in the back seat. Abron jumped out of the truck and tried to run away, but Appellant shot him in the back. Abron later died from the gunshot wound. Walker crawled into the driver's seat of the truck and drove away. Appellant got into the white van and fled. Barnes and two witnesses who were outside a neighboring house identified Appellant as the shooter. All

---

[2] According to Barnes, he held his hands up as he walked away. According to a witness who saw the exchange from outside a neighboring house, Barnes did not hold his hands up, and he told Appellant, "It ain't that serious," while Appellant said, "You think I'm playing with you?"

three witnesses knew Appellant, and all three picked him out of a photo lineup.[3]

Investigators found a black ski mask on the porch of 1206 Seiler Avenue and four shell casings on the street in front, all of which were fired from the same 9-millimeter gun. Alisha Cooper, who was Appellant's girlfriend, had seen him with a 9-millimeter gun, and three or four days before the shooting, he told her that he was looking for 9-millimeter bullets. After the shooting, Appellant told Cooper that he shot Barnes because Barnes confronted him about some kind of set-up with a mask and "it was either [Barnes] or him."[4] Cooper owned a white van, which Appellant borrowed on the day of the shooting.

Appellant did not testify at trial. His main defense theory was that the police did not do a thorough investigation and the

---

[3] When Barnes first spoke to the police, he gave a different account of the shooting, saying that a man who drove up in a black car approached him, asked for money, and then shot him. Walker did not see the shooter. None of the witnesses saw anyone else with a gun.

[4] The statements from Cooper linking Appellant to a 9-millimeter gun and referencing a set-up with a mask come from her video-recorded interview with Detective Puhala, which, as discussed in Division 2 below, was played for the jury.

witnesses, most of whom had criminal records and had changed their stories to some extent, were "liars."

Appellant does not dispute the legal sufficiency of the evidence supporting his convictions. Nevertheless, as is this Court's usual practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. (a) At trial, Cooper initially testified that Appellant had not told her anything about the shooting, but on cross-examination, she said that Appellant told her that he shot at other people because "it was either him or them." When the prosecutor questioned her about

the interview she gave to Detective Puhala two weeks after the shooting, she first said that she did not recall and then denied telling the detective that Appellant said Barnes "tried to get him set up by a mask or something."[5] After further questioning about inconsistencies between her trial testimony and what she said in her interview with Detective Puhala, Cooper claimed that the detective had threatened to take away her children and charge her as an accessory to murder. After her testimony, she was kept under subpoena at both parties' request.

Later in the trial, Detective Puhala testified that he did not threaten Cooper, and the State moved to admit the video recording of the detective's interview of Cooper to show that Detective Puhala did not threaten her. Appellant made an objection on hearsay grounds, which the trial court overruled, and the State then played

---

[5] The interview occurred after Cooper was arrested for cocaine possession, giving a false statement, and hindering the apprehension of a fugitive; she had lied about knowing where Appellant was and drove him to Augusta on the night of the crimes. She ultimately pled guilty to all three crimes.

the recording for the jury.[6]

About nine minutes into the eighteen-minute recording, Cooper said that Appellant told her that he shot Barnes because Barnes had come to confront him about getting set up with a mask, "I guess trying to rob someone or whatever." Appellant objected and moved for a mistrial on the ground that it was improper to put evidence before the jury that Appellant may have been involved in another crime. The State said that the evidence was proper because it went to Appellant's reason for shooting Barnes and because it was inconsistent with Cooper's testimony that she did not tell the detective anything about a mask set-up. The court denied Appellant's mistrial motion.

(b) Appellant argues that the trial court erred by admitting the interview recording into evidence. The recording was admissible, however, to impeach Cooper by contradiction. See OCGA § 24-6-621

---

[6] Appellant also argued that it would be improper for the jury to hear the detective and Cooper's discussion on the recording about a prior killing in which Appellant was allegedly involved. The State agreed not to play that part of the recording.

7

("A witness may be impeached by disproving the facts testified to by the witness."). After Cooper testified that Detective Puhala threatened her during the interview, playing the recording of the interview — during which the detective did *not* threaten her — was a permissible way to impeach Cooper's untruthful statement. See *Wilkins v. State*, 291 Ga. 483, 488 (731 SE2d 346) (2012) (holding that a recorded phone call was properly admitted under the former version of OCGA § 24-6-621 to contradict the witness's testimony that no one from the State had called her).[7] Under these circumstances, the trial court's admission of the recording was not an abuse of discretion. See *Taylor v. State*, 302 Ga. 176, 180 (805

---

[7] This case was tried under Georgia's new Evidence Code. The language of OCGA § 24-6-621 was carried forward in the new Code from former OCGA § 24-9-82, and it has no federal counterpart. See *Taylor v. State*, 302 Ga. 176, 180 n.5 (805 SE2d 851) (2017). Accordingly, "'we give the new provision the same meaning as the old one.'" *Budhani v. State*, 306 Ga. 315, 325 n.10 (830 SE2d 195) (2019) (citation omitted). We note, however, that although the Federal Rules of Evidence do not have a rule expressly addressing impeachment by contradiction, "federal jurisprudence does recognize impeachment by contradiction and there is some consensus that OCGA § 24-6-621 may be read in conjunction with OCGA §§ 24-6-607 and/or 24-6-613 (b), as well as their federal counterparts." *Taylor*, 302 Ga. at 180 n.5.

SE2d 851) (2017).[8]

(c) Appellant further argues that the trial court should have granted a mistrial after the jury heard Cooper's recorded statement about a mask set-up and a possible robbery, because the statement indicated that Appellant had been involved in another crime. That recorded statement was admissible, however, as a prior inconsistent statement by Cooper. See OCGA § 24-6-613 (b) (providing for the admission of extrinsic evidence of a prior inconsistent statement if "the witness is first afforded an opportunity to explain or deny the prior inconsistent statement and the opposite party is afforded an opportunity to interrogate the witness on the prior inconsistent statement or the interests of justice otherwise require"). See also OCGA § 24-8-801 (d) (1) (A).

Cooper's statement about the mask set-up during the recorded interview was inconsistent with her trial testimony first that

---

[8] To the extent Appellant also claims that the admission of the recorded interview violated his constitutional right to confront Cooper, that claim fails because Cooper "testified at trial and was subject to cross-examination." *Varner v. State*, 306 Ga. 726, 730 (2) (b) (i) (__ SE2d __) (2019).

Appellant did not tell her anything about the shooting and then that Appellant said only that he shot at other people because "it was either him or them." Appellant does not argue that the procedural requirements of OCGA § 24-6-613 (b) were not met.[9] Instead, the thrust of his argument appears to be that even if Cooper's statement could have been used to impeach her, it was nonetheless inadmissible because its probative value was substantially outweighed by the unfair prejudice to Appellant resulting from the jury's being told about his involvement in another crime. See OCGA § 24-4-403.

We disagree. The evidence of the mask set-up as a reason for the confrontation between Appellant and Barnes was significantly probative because it indicated Appellant's motive for a shooting that otherwise had no obvious motive. See, e.g., *Anglin v. State*, 302 Ga.

---

[9] At trial and on appeal, the State has argued that the *entire* interview recording was admissible as Cooper's prior inconsistent statement. But the parts of the interview played to show what *Detective Puhala* told Cooper were not *Cooper's* prior inconsistent statements. Other statements that Cooper made during the interview, in addition to her statement about the mask set-up and possible robbery, were inconsistent with her trial testimony, but Appellant does not complain about any other specific statements by Cooper.

333, 337 (806 SE2d 573) (2017) (holding that evidence that helped explain the appellant's motive was probative). And the reference to the robbery was not especially prejudicial; it was not even clear from Cooper's oblique reference to "trying to rob someone or whatever" whether Appellant, Barnes, or both had participated in this robbery "or whatever." Accordingly, the trial court did not abuse its discretion in denying a mistrial. See *Wade v. State*, 304 Ga. 5, 9-10 (815 SE2d 875) (2018).[10]

3. (a) Before trial, Appellant gave notice that he intended to introduce into evidence Barnes's prior criminal convictions to impeach Barnes. Two sets of those convictions carried prison sentences that ended within ten years of Appellant's trial.[11] The trial

---

[10] Appellant also argues that the reference to the robbery was inadmissible under OCGA § 24-4-404 (b), but as discussed above, even if we construe Cooper's statement as evidence of another crime in which Appellant was involved, it was admissible as intrinsic evidence of Appellant's motive. See *Smith v. State*, 307 Ga. 106 (834 SE2d 1) (2019).

[11] In 2001, Barnes was convicted of possession of a controlled substance, possession of less than an ounce of marijuana, and open container. In 1998, he was convicted for sale of marijuana, sale of marijuana within 1,000 feet of a public housing project, and obstruction. For each set of convictions, he was sentenced to serve eight years in prison.

11

court ruled that those convictions were admissible. Appellant also sought to introduce into evidence three sets of Barnes's convictions with sentences that ended more than 15 years before Appellant's trial.[12] The court ruled that the probative value of these older convictions did not substantially outweigh their prejudicial effect and excluded them from the evidence. During direct examination of Barnes, the State introduced into evidence a set of Barnes's convictions from 2008.[13] During cross-examination, Appellant introduced Barnes's 1998 and 2001 convictions.

(b) OCGA § 24-6-609 provides for the admission of a witness's prior convictions for impeachment purposes. Subsection (b) of this statute has a special rule for convictions that are older than ten years:

> Evidence of a conviction under this Code section shall not be admissible if a period of more than ten years

---

[12] In 1995, Barnes pled guilty to ten counts of entering an auto to commit theft and one count of fraudulent receipt of goods. Also in 1995, he pled guilty to theft by taking, theft by receiving, entering an auto to commit theft, and obstruction. In 1996, he pled guilty to entering an auto to commit theft and obstruction.

[13] In 2008, Barnes pled guilty to possession of cocaine, possession of less than an ounce of marijuana, obstruction by fleeing, obstruction by giving false information, and failure to notify after striking an unattended vehicle.

has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for such conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old, as calculated in this subsection, shall not be admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

Thus, Rule 609 (b) establishes a presumption against using convictions over ten years old to impeach witnesses; "such convictions 'will be admitted very rarely and only in exceptional circumstances.'" *United States v. Tisdale*, 817 F2d 1552, 1555 (11th Cir. 1987) (quoting *United States v. Cathey*, 591 F2d 268, 276 (5th Cir. 1979)).[14] The trial court's decision is reviewed for an abuse of

---

[14] "Rule 609 of Georgia's new Evidence Code is materially identical to Rule 609 of the Rules of Federal Evidence, and, as such, we look to federal case law with respect to the interpretation and application of the rule." *Brown v. State*, 307 Ga. 24, 30 (3) n. 2 (__ SE2d __) (2019) (citations and punctuation omitted). This is true even though OCGA § 24-6-609 (b) is also materially identical to its predecessor under the old Evidence Code. See *State v. Almanza*, 304 Ga. 553, 558 (820 SE2d 1) (2018). See also *Clay v. State*, 290 Ga. 822, 833 (725 SE2d 260) (2012) (explaining that the former version of Georgia's Rule 609 (b) mirrored the federal rule). Rule 609 (b) reverses the usual rule that evidence is admissible unless its probative value is substantially outweighed

discretion. See *Cathey*, 591 F2d at 274 n.11. Appellant argues that despite their age, the three excluded sets of Barnes's convictions should have been admitted for three reasons. None of those reasons is persuasive.

First, Appellant argues that the trial court erred by failing to identify on the record what factors formed the basis of its conclusion that the probative value of the old convictions did not substantially outweigh their prejudicial effect. The trial court was not required to make such findings on the record, however, because the court *excluded* the convictions. See *United States v. Estes*, 994 F2d 147, 149 (5th Cir. 1993) ("It is only when the court *admits* evidence of a conviction over ten years old that the court must engage in a balancing test on the record." (emphasis added)). See also *United States v. Mahler*, 579 F2d 730, 736 (2d Cir. 1978) (explaining that when a trial court admits convictions more than ten years old, it "should make an on-the-record determination supported by specific

by its prejudicial effect. See OCGA § 24-4-403; *State v. Orr*, 305 Ga. 729, 737 n.7 (827 SE2d 892) (2019).

14

facts and circumstances that the probative value of the evidence substantially outweighs its prejudicial effect"); *United States v. Cavender*, 578 F2d 528, 531-532 (4th Cir. 1978) (explaining that if the trial court makes the "exceptional" decision to admit a conviction older than ten years, it must support that decision with findings on the record). Cf. *Clay v. State*, 290 Ga. 822, 838 (725 SE2d 260) (2012) (following *Mahler* in applying Georgia's former version of Rule 609 (b) and requiring a trial court to make an on-the-record finding before admitting evidence of an old conviction for impeachment purposes).

Second, Appellant argues that the trial court should have automatically admitted Barnes's old convictions because they were for crimes of dishonesty. Appellant points to OCGA § 24-6-609 (a) (2), which says that convictions for crimes requiring proof of dishonesty or making a false statement are admissible for impeachment of witnesses other than the defendant "regardless of the punishment," whereas convictions for all other kinds of crimes are admissible only "if the crime was punishable by death or

imprisonment in excess of one year," OCGA § 24-6-609 (a) (1). But even assuming that some of Barnes's excluded convictions were for crimes of dishonesty, Rule 609 (a) does not help Appellant, because the convictions were excluded not based on their punishment level but based on their age. The age issue is governed by Rule 609 (b), which expressly applies to "[e]vidence of a conviction under this Code section," meaning convictions falling under Rule 609 (a) (1) *or* (2). See *United States v. Charles*, 366 Fed. Appx. 532, 541 (5th Cir. 2010) ("Rule 609 (b)'s ten-year limit applies as a separate test of all convictions, even ones where 'it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness.'" (quoting federal Rule 609 (a) (2))). Furthermore, merely showing that a conviction older than ten years involved a crime of dishonesty is not sufficient to prove that the probative value of the conviction substantially outweighed its prejudice. See, e.g., *Cathey*, 591 F2d at 276 ("The presumption against the use of an over-age conviction is not so weak that it falls before a finding that the prior conviction

was for a crime involving dishonesty.").

Finally, Appellant asserts that even if the probative value of the excluded convictions did not substantially outweigh their prejudicial effect initially, the convictions became admissible after the State made Barnes's criminal history an issue by offering into evidence certified copies of his 2008 convictions. But the State did not imply that the convictions it presented were Barnes's *only* convictions, so admission of his older convictions was not necessary to rebut an incorrect implication. Nor has Appellant explained how evidence of Barnes's more recent convictions increased the probative value of his old convictions. To the contrary, the admission of Barnes's other convictions *diminished* the probative value of his much older convictions, because the jury was aware even without the old convictions that Barnes had a substantial criminal history (and became even more aware of that fact when his 1998 and 2001 convictions were admitted on cross-examination). See *United States v. Tisdale*, 817 F2d 1552, 1555 (11th Cir. 1987) (holding that the probative value of three over-age convictions was low in light of the

witness's impeachment with three more recent convictions as well as his plea agreement for testifying).

For these reasons, the trial court did not abuse its discretion by excluding from evidence Barnes's convictions that were more than ten years old.

4. (a) Walker, who had been in the Silverado with Abron and Barnes, drove the truck away from the scene of the shooting before the police arrived. He was located when investigators tracked Abron's cell phone to the house where Walker was staying with his grandparents. Officers searched the house and found an AK-47 rifle hidden under a mattress. When questioned, Walker admitted knowing about the gun but said that it belonged to his friend Fernando Harrison. Walker testified that after the shooting, he abandoned the Silverado on another street, taking three cell phones and CDs from the truck, and he called Harrison, who gave him a ride; eventually they went to Walker's grandparents' house.

At trial, Appellant attempted to question Walker and Detective Puhala about the AK-47, but the State objected both times.

Appellant argued that the AK-47 could have come from the Silverado, which would mean that someone other than Appellant had a gun at the time of the shooting, which in turn could support the theory that Appellant acted in self-defense. The trial court sustained the State's objections, ruling that the potential probative value of evidence about the AK-47 was substantially outweighed by the danger of confusion of the issues before the jury.

(b) Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable. . . ." OCGA § 24-4-401. However,

> [r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

OCGA § 24-4-403.

Appellant's theory, fully spelled out, is that evidence of the AK-47 was relevant and probative because the jury might infer from the presence of a firearm under a mattress in the house where Walker stayed that Walker or someone else in the Silverado could have been

19

armed with that rifle earlier in the day, and that person could have used it to threaten Appellant, who could have seen the rifle and then could have fired his own gun in self-defense. In light of how strained this series of inferences is, even if we assume that the AK-47 evidence was relevant, we doubt that the trial court abused its discretion by ruling that the extremely low probative value of the evidence was substantially outweighed by the confusion for the jury that could be caused by the introduction of evidence of a firearm with, at best, a tangential connection to the charged crimes.

But even if the trial court erred, any such error was harmless. Not only would Appellant's theory require the jury to have made a series of dubious inferences, but those inferences were directly contradicted by the evidence that none of the eyewitnesses saw anyone but Appellant with a gun. There was also no evidence that Appellant saw anyone in the Silverado with a gun before he opened fire; instead, the evidence showed that Appellant first shot Barnes in front of the house and then shot Abron in the back after Abron got out of the truck and tried to run away. Accordingly, it is highly

probable that the exclusion of evidence of the AK-47 did not contribute to the verdicts. See *Faust v. State*, 302 Ga. 211, 215 (805 SE2d 826) (2017).

5. Before trial, Appellant invoked the rule of sequestration, and the prosecutor requested that Detective Puhala, as the lead detective on the case, be allowed to remain in the courtroom. The trial court granted the request over Appellant's objection, which he contends was error.

OCGA § 24-6-615 says:

> Except as otherwise provided in Code Section 24-6-616, at the request of a party the court shall order witnesses excluded so that each witness cannot hear the testimony of other witnesses, and it may make the order on its own motion. This Code section shall not authorize exclusion of:
> (1) A party who is a natural person;
> (2) An officer or employee of a party which is not a natural person designated as its representative by its attorney; or
> (3) A person whose presence is shown by a party to be essential to the presentation of the party's cause.

"It is within a trial court's discretion to exempt the government's chief investigative agent from sequestration, and it is well settled

that such an exemption is proper under [Federal] Rule [of Evidence] 615 (2), deeming the agent-witness a 'representative' of the government." *United States v. Rivera*, 971 F2d 876, 889 (2d Cir. 1992) (citation omitted). See also *United States v. Butera*, 677 F2d 1376, 1381 (11th Cir. 1982) ("As a case agent, [the lead investigator] was clearly exempted under Rule 615 (2).").[15] Thus, the trial court did not abuse its discretion by allowing Detective Puhala to remain in the courtroom.

6. The trial court denied Appellant's request that the jury be instructed on voluntary manslaughter as a lesser offense of murder.

> A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]

---

[15] "The text of OCGA § 24-6-615 differs significantly from the text of the sequestration provision of the old Evidence Code, and instead tracks in pertinent part the language of Federal Rule of Evidence 615 as that rule read in 2011," meaning that we look for guidance to the decisions of the federal appellate courts on Rule 615, not our precedent under the old Evidence Code. *Davis v. State*, 299 Ga. 180, 185 (787 SE2d 221) (2016). See also footnote 14 above.

OCGA § 16-5-2 (a). Appellant argues that the evidence showing that he was acting "in an aggressive way" demonstrates that he was under the influence of a passion caused by some kind of provocation resulting from the interaction between him and Barnes. But there was no evidence that Barnes did anything other than speak to Appellant (and maybe hold up his empty hands) before Appellant started shooting. This Court has repeatedly held that, "[a]s a matter of law, angry statements alone ordinarily do not amount to serious provocation within the meaning of OCGA § 16-5-2 (a)." *Jackson v. State*, 301 Ga. 878, 881 (804 SE2d 357) (2017) (citation and punctuation omitted). Because there was not even slight evidence of voluntary manslaughter, the trial court did not err in declining to give the requested instruction. See id. at 880-881.

    *Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 21, 2019.

Murder. Chatham Superior Court. Before Judge Freesemann.

*Robert L. Persse*, for appellant.

*Meg E. Heap, District Attorney, Emily C. Puhala, Nancy Grey R. Smith, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Vanessa T. Sassano, Assistant Attorney General*, for appellee.