313 Ga. 827
FINAL COPY

S22A0103.  WYNN v. THE STATE.

COLVIN, Justice.

Bobby Leon Wynn appeals following his conviction for malice murder in connection with the death of Demontae Ware.[1]  Wynn raises six enumerations of error, challenging allegedly improper impeachment evidence, the exclusion of mental-health testimony, the failure to charge the jury on a lesser-included offense, allegedly improper legal testimony, an allegedly improper self-defense charge, and cumulative error.  We affirm.

---

[1] Ware died on September 7, 2014.  On December 5, 2014, a Fulton County grand jury indicted Wynn on charges of malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), and aggravated assault (Count 3).  At a trial held from March 29 to 31, 2016, the jury found Wynn guilty of all three counts.  The trial court sentenced Wynn to serve life in prison without the possibility of parole for malice murder, and the remaining counts were either merged for sentencing purposes or vacated by operation of law.  Wynn filed a timely motion for new trial on April 26, 2016, and amended the motion on January 17, 2020.  After conducting a hearing on April 22, 2021, the trial court denied the motion on April 28, 2021.  The case was docketed in this Court to the term beginning in December 2021 and submitted for a decision on the briefs.

The evidence presented at trial showed that Wynn, who was an inmate at the Fulton County Jail, shared a cell with Ware on September 7, 2014. In the early hours of that morning, Wynn used cloth to strangle Ware to death.

Following the strangling, a detention officer tasked with delivering food to the inmates arrived at Wynn's cell. The cell was dark, and he instructed Wynn to turn the lights on. Wynn complied and then calmly told him, "I had to do it." The officer asked, "You had to do what?" Wynn responded, "I had to kill him." The officer observed Ware on the ground but believed Wynn and Ware were playing a joke on him. He completed his task of delivering food trays before returning to the cell. At that point, the officer determined that Ware was not responding and called for assistance.

When medical personnel arrived, they found cloth pieces tied around Ware's neck and hands. The cloth was tied so tightly that it could not be removed without the use of special medical tools. Ware was taken to the hospital, where he was pronounced dead.

According to a medical examiner, strangulation could cause

unconsciousness in 12 to 15 seconds, but it would not cause death absent several minutes of consistent pressure. An autopsy later revealed that Ware's strangulation had caused a hemorrhage in his neck muscles and a fracture in the hyoid bone at the top of his neck.

Testifying in his own defense, Wynn claimed that he woke up to find Ware punching him in the back of the head and biting him. Wynn claimed that he tried to fight Ware off but got pushed up against the door, where he jammed his shoulder and scraped his back.[2] At that point, he said, "I was like, well, I got to do something [because] this guy's going to kill me." According to Wynn, he unraveled cloth strips that had been wrapped around his hands as makeshift boxing gloves, wrapped the strips around Ware's neck, and pulled until Ware passed out. Once Ware was "knocked out," Wynn said, he tied the strips around Ware's neck, and Ware fell to the ground. Wynn said that he then used additional cloth to tie Ware's hands behind his back so Ware could not remove the

---

[2] However, an investigator who met with Wynn following the killing observed that he had only a minor abrasion on his shoulder and a bumped or scraped knee.

3

restraint on his neck and harm Wynn again. Wynn claimed that he had hit the panic button in his cell and screamed for help during the altercation and again after tying Ware's hands, but officers did not come.

An inmate who was in a nearby cell during Ware's strangulation testified that he heard Wynn yell "he's attacking me" and "help" a few times but that he did not believe Wynn's calls for help were serious because he did not think Ware would attack Wynn. The inmate further said that, although the detention officers would have known that Wynn had pushed the panic button, they likely would not have heard him yelling, and they did not respond.

1. Wynn argues that the trial court plainly erred in permitting the State to use allegations that Wynn had committed a prior sexual assault against another inmate in 2011 to impeach Wynn and in failing to instruct the jury to disregard the resulting testimony.[3] We disagree.

---

[3] Although the State filed a pretrial motion under OCGA § 24-4-404 (b) to admit evidence that Wynn had allegedly raped a fellow inmate in 2011 to

4

On cross-examination of Wynn, the State sought to impeach him by asking about his prior convictions for being a felon in possession of a firearm, criminal damages to property, entering an automobile, and theft by taking.[4] Wynn admitted that he had pled guilty to the charges. On redirect examination, defense counsel asked Wynn, "Have you ever had any convictions where you hurt anyone?" Wynn responded, "No, I never actually hurt anyone before." The following exchange then occurred on re-cross:

Q: You also just testified that you'd never hurt anyone before; is that right?
A: No.
Q: In 2011[,] you were actually investigated and the jail actually brought administrative charges against you for assaulting another cellmate of yours; is that right?
A: No. I have not been — I have not assaulted anybody in 2011.
Q: So are you saying that in 2011 you didn't sexually assault Roger Thomas in your cell on June 14th, 2011?
A: No, sir. He just said that so he could get out of the cell.
. . .
Q: So are you saying you didn't rape your cellmate in 2011?
A: No, I didn't rape anyone.

show motive and intent, the State later withdrew its motion, conceding that there was no evidence of sexual assault in this case.

[4] Before trial, the State filed notices of intent to introduce the prior convictions for impeachment purposes.

Defense counsel did not object to this line of questioning but instead followed up by asking Wynn, "you're saying that [the inmate] made [the rape allegation] up?" Wynn responded, "Yeah."

During its closing argument, the State argued that Wynn had not testified credibly. The State noted that Wynn had "a motive to shade and color his testimony and exaggerate it" because "[h]e's got an interest in the outcome of the case." The State further argued that, based on his trial testimony, "we already know that [Wynn is] prone to exaggerating and lying himself out of trouble." To support this contention, the State cited instances in which Wynn had lied or otherwise denied responsibility for conduct on the stand, including when he claimed that he "didn't rape [his] cellmate."

On appeal, Wynn argues that the trial court should have excluded the impeachment evidence. He contends that the evidence was clearly inadmissible because the allegations that he committed sexual assault were irrelevant, see OCGA § 24-4-401, unfairly prejudicial, see OCGA § 24-4-403, testimonial statements that

6

violated the Confrontation Clause of the Sixth Amendment to the United States Constitution, and hearsay without an exception, see OCGA § 24-8-801 (c). He further argues that the trial court should have sua sponte given a curative instruction to address unfair prejudice arising from the impeachment evidence.

Because Wynn did not raise any objection regarding the impeachment evidence at trial and did not request a curative instruction, we review these issues only for plain error. See *Grier v. State*, 313 Ga. 236, 240 (3) (869 SE2d 423) (2022) (unpreserved Confrontation Clause and hearsay objections reviewed for plain error); *Dunn v. State*, 312 Ga. 471, 477 (2) (b) (863 SE2d 159) (2021) (unpreserved relevance objection reviewed for plain error); *Castillo-Velasquez v. State*, 305 Ga. 644, 652 (4) (827 SE2d 257) (2019) (unpreserved Rule 403 objection reviewed for plain error); *Davis v. State*, 302 Ga. 576, 582 (3) (805 SE2d 859) (2017) (failure to sua sponte give curative instruction regarding impeachment evidence reviewed for plain error). To establish plain error, a defendant must show that (1) an error occurred, which was not affirmatively waived,

7

(2) the error was clear and obvious, (3) the error "affected his substantial rights," and (4) the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Grier*, 313 Ga. at 240-241 (3) (citation and punctuation omitted).

Here, Wynn's claim fails on the first prong of plain-error review because he has not identified any error. "When the criminal defendant takes the stand, any discrepancies in his testimony may be fully explored on cross-examination regardless of their relevance or the fact that it may reflect poorly on the defendant's character." *Taylor v. State*, 302 Ga. 176, 180 (3) (805 SE2d 851) (2017) (citation and punctuation omitted). By testifying that he had "never actually hurt anyone before," Wynn invited the State to cross-examine him on the matter in an attempt to contradict and discredit his testimony. See OCGA § 24-6-621 ("A witness may be impeached by disproving the facts testified to by the witness."). The State did just that, asking targeted questions intended to elicit testimony that Wynn had in fact hurt someone before. See *Taylor*, 302 Ga. at 180 (3) ("The prosecutor's cross-examining appellant about the nature of

8

the altercation with his girlfriend was admissible for the purpose of impeachment inasmuch as appellant testified dishonestly about the reasons why he had been ejected from his girlfriend's car."); see also *Anderson v. State*, 307 Ga. 79, 82 (2) (b) (834 SE2d 830) (2019) (holding that the State was permitted to admit an interview recording "to impeach [the witness] by contradiction").

Nor did the court err in failing to exclude the impeachment evidence under OCGA § 24-4-403 ("Rule 403"), which provides:

> Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

"[T]he exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly." *Venturino v. State*, 306 Ga. 391, 395 (2) (b) (830 SE2d 110) (2019) (citation and punctuation omitted). Here, although Wynn argues that the State's questions "suggested that it was Wynn's nature to commit serious violent felonies against his cellmates," the State never argued to the jury that the evidence demonstrated Wynn's

propensity for violence but rather that his testimony about the alleged sexual assault reflected badly on his credibility. Moreover, Wynn's testimony that he had "never actually hurt anyone before" suggested that he lacked a propensity for violence, opening the door to the State's limited impeachment. See OCGA § 24-4-405 (b). Given the limited and probative nature of the State's inquiry, the impeachment evidence was not substantially more prejudicial than probative. See *Dunbar v. State*, 309 Ga. 252, 255-256 (2) (845 SE2d 607) (2020) (holding that Rule 403 did not require the trial court to exclude evidence of an AK-47 rifle found during a search of the defendant's home, which was admitted as impeachment evidence "only after [the defendant] herself opened the door for its admission" by testifying that she "never wanted to see a gun in her life" (punctuation omitted)).

Moreover, the record belies Wynn's contention that the State's questions introduced out-of-court statements that might run afoul of the Confrontation Clause and hearsay rules. See OCGA § 24-8-801 (c) ("'Hearsay' means [an out-of-court] *statement* . . . offered in

10

evidence to prove the truth of the matter asserted." (emphasis supplied)); *Wilson v. State*, 313 Ga. 319, 323 (2) (a) (869 SE2d 384) (2022) ("[T]he Confrontation Clause . . . applies only to testimonial *statements*[.]" (emphasis supplied)). Rather than asking Wynn about what the inmate had *said* about the alleged sexual assault, the State asked whether Wynn had in fact sexually assaulted the inmate and been charged with doing so.

We discern no error in the trial court's permitting the testimony, and a curative instruction was unnecessary.

2. Wynn argues that the trial court erred in excluding as irrelevant testimony from Racquel McGee, a mental-health-services provider at the Fulton County Jail. Although we conclude that the testimony was relevant, we also conclude that the trial court's error in excluding the testimony was harmless.

At trial, the court conducted a hearing outside the presence of the jury to determine whether the State could use statements Wynn had made to several investigators for impeachment purposes. The court heard testimony from the investigators, as well as from

11

McGee.  Lieutenant Audrey Payton, a jail unit manager tasked with handling an administrative investigation into Ware's death, spoke with Wynn shortly after the incident.  According to the lieutenant, Wynn told her, among other things, that Ware had urinated on him in the middle of the night and that Ware had ignored Wynn's requests not to use the water fountain, even though Ware "had a nasty sore on his mouth."  The lieutenant testified that, when he made his statement, Wynn was articulate and calm and appeared to understand what was going on.

Sergeant Sandra Reese testified that she had interviewed Wynn about two weeks after the incident in connection with an administrative disciplinary hearing.  Wynn told Sergeant Reese that he was set up by staff and had not killed Ware.  According to Sergeant Reese, Wynn said that Ware was alive when an officer escorted him out of the cell, and that, when the officer returned him to the cell, Ware was on the floor with his neck and hands tied.  Wynn further told Sergeant Reese that the officer locked Wynn in the cell with Ware, and Wynn put a sheet over Ware's body.

Sergeant Reese said that Wynn "was very eager to talk about the situation," was talking in an appropriate manner the way a normal person would, and appeared to understand what was going on.

The court also heard testimony from McGee, who said that she had observed Wynn in the psychiatric observation unit on several occasions both before and after Ware's death. According to McGee, Wynn was placed in the unit immediately after Ware's death, and McGee observed that he was acting as he typically did, being loud, yelling at people, and punching in the air. McGee testified that she had only briefly conversed with Wynn because it was difficult for most people to talk with him, and he appeared not to like her. McGee further said that, when medicated, Wynn was like a normal person and would speak, but that he was on and off his medication around the time of the incident. McGee admitted that she was not present when investigators spoke with Wynn and that she had no opinion as to whether the conversations Wynn had with investigators were similar to her own conversations with him or whether he acted appropriately during those interviews.

Based on the above testimony, the court found by a preponderance of the evidence that Wynn's statements to investigators were voluntary. The court further ruled that McGee's testimony was irrelevant. Accordingly, the court permitted the State to use Wynn's prior statements to investigators for impeachment purposes and excluded McGee's testimony.

On cross-examination, the State questioned Wynn about several of his prior statements. Among other things, Wynn denied telling Lieutenant Payton that Ware had urinated on him and admitted that he lied to Sergeant Reese about Ware being alive when he left the cell "because [he] wanted to get [the officers] in trouble" and frame them for murder. Wynn claimed that he "wasn't really in a good state of mind" when he made up the story he told to Sergeant Reese. On redirect, Wynn elaborated on his state of mind, saying that he suffered from bipolar disorder and that he was "pretty much out of control" when he gave his statement to Sergeant Reese because he was not properly medicated at the time.

After the defense rested, the State called Sergeant Reese in

rebuttal. In her testimony, Sergeant Reese reiterated what she had previously told the court about the statements Wynn had made during his administrative disciplinary hearing. Wynn then testified in surrebuttal that, when he spoke to Sergeant Reese, he "was very bipolar" and "wasn't on [his] medicine, so [he] was just saying anything."

On appeal, Wynn argues that the trial court erred in excluding McGee's testimony as irrelevant. He contends that McGee's testimony tended to show that his prior statements to investigators were involuntary because he was incompetent at the time and that deciding whether his statements were voluntary was ultimately a question for the jury. See *State v. Tye*, 276 Ga. 559, 561 (2) (580 SE2d 528) (2003) (noting that, in determining the voluntariness of a statement, "mental condition is surely relevant to an individual's susceptibility to police coercion" (citation and punctuation omitted)); *Volkova v. State*, 311 Ga. 187, 190-191 (2) (855 SE2d 616) (2021) ("[D]etermining the voluntariness and, consequently, the admissibility of a defendant's statement in a criminal case is a two-

step process. Initially, the trial court addresses the issue outside the presence of the jury and, if the statement is determined to be voluntary, it is admitted for the jury to make the ultimate determination as to its voluntariness and, thus, its probity as inculpatory evidence." (citation and punctuation omitted)); *Robles v. State*, 277 Ga. 415, 420 (7) (589 SE2d 566) (2003) (noting that a "court [must] make a determination as to the voluntariness of [a defendant's custodial] statement" before admitting the statement for impeachment purposes).[5]

Although McGee's testimony was relevant to whether Wynn's statements to investigators were voluntary, "we conclude that its exclusion was harmless." *Walker v. State*, 296 Ga. 161, 168 (2) (766 SE2d 28) (2014). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Smith v. State*, 299 Ga. 424, 432 (2) (d) (788 SE2d 433) (2016) (citation and punctuation omitted).

---

[5] The trial court charged the jury that it needed to find that Wynn's prior statements were voluntary before it could rely upon them.

16

Here, Wynn introduced through his own testimony evidence that he suffered from bipolar disorder and that he was "pretty much out of control" and "just saying anything" to investigators because he was not properly medicated at the time. In light of this testimony, McGee's proposed testimony was of little probative value. At most, McGee could have bolstered Wynn's claim that he did not act normally when not properly medicated and that he might not have been properly medicated when investigators interviewed him. Because McGee was not present for the interviews and did not know whether he was medicated at the time, however, she could not opine on Wynn's mental condition when he spoke to investigators. Thus, on the point that was key to Wynn's argument that his statements were involuntary, McGee had no firsthand knowledge. Moreover, the combination of McGee's testimony that Wynn appeared normal when properly medicated and Sergeant Reese's testimony that Wynn appeared normal when giving his statement undermined Wynn's claim that he was off his medication at the time.

Further, "any error is harmless in this case given the

substantial evidence of appellant's guilt." *Parks v. State*, 300 Ga. 303, 308 (2) (794 SE2d 623) (2016). The evidence showed that Wynn not only strangled Ware with cloth but tied the cloth so tightly that it caused a hemorrhage and broke a bone in Ware's neck. The evidence further showed that, although Wynn could have rendered Ware unconscious by strangulation in 12 to 15 seconds, causing Ware to die from strangulation required Wynn to apply consistent pressure on Ware's neck for several minutes. Moreover, Wynn admitted at trial that, after Ware passed out, Wynn tied Ware's hands behind his back such that it would have been impossible for him to relieve the tension on the cloth tied around his neck even if he regained consciousness. Given the strong evidence of Wynn's guilt, we conclude that "it is highly probable" that any error in excluding McGee's proposed testimony from the jury's consideration "did not contribute to the verdict." *Smith*, 299 Ga. at 432-433 (2) (d).

3. Wynn argues that the trial court erred in failing to instruct the jury on involuntary manslaughter as a lesser-included offense of malice murder. Specifically, Wynn argues that the court

18

should have charged the jury on subsection (a) of OCGA § 16-5-3, which provides:

> A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony. . . .

OCGA § 16-5-3 (a). Wynn did not object to the court's failure to give an involuntary manslaughter instruction after the court charged the jury. "[C]onsequently, review of the issue by this Court is precluded by OCGA § 17-8-58 unless plain error is shown." *Barron v. State*, 297 Ga. 706, 707-708 (2) (777 SE2d 435) (2015) (footnote omitted) (reviewing the trial court's failure to give a requested jury charge for plain error because the defendant did not renew his objection after the court charged the jury); see also OCGA § 17-8-58 (b) (noting that this Court reviews for plain error unpreserved objections to a jury charge).

Wynn has not carried his burden to show plain error because he has not established that the asserted error "was obvious beyond reasonable dispute." *Horton v. State*, 310 Ga. 310, 319 (3) (849 SE2d

19

382) (2020) (citation and punctuation omitted). Wynn contends that the court should have given an involuntary manslaughter charge because his testimony at trial provided more than slight evidence supporting the charge. See *Soto v. State*, 303 Ga. 517, 520 (2) (813 SE2d 343) (2018) ("A written request to charge a lesser included offense must always be given if there is any evidence that the defendant is guilty of the lesser included offense." (citation and punctuation omitted)). Specifically, Wynn points to his testimony that, "when [he] tied that [cloth string] around [Ware's] neck, [he] didn't mean to kill [Ware,]" which he contends could have supported a finding that he "cause[d] the death of [Ware] without any intention to do so." OCGA § 16-5-3 (a).

This argument, however, takes Wynn's testimony out of context. First, it ignores what he said immediately following these statements — "I [was] just trying to defend myself" — which indicated that he intended to kill Ware in self-defense. Second, the argument ignores Wynn's conflicting admission that he "intentionally tied the string" around Ware's neck *after* Wynn had

20

passed out from the strangulation and "wasn't moving" anymore and that "the point" of tying Ware's hands behind his back was to prevent Ware from removing the cloth around his neck so Ware could not strike Wynn again.[6]

While Wynn's testimony provided slight evidence supporting a self-defense charge, there was no evidence supporting a charge that Wynn unintentionally killed Ware, given Wynn's admission that he intentionally strangled Ware and intentionally took additional steps to prevent Ware from untying the cloth that had rendered Ware unconscious. See *Williams v. State*, 301 Ga. 712, 718 (5) (804 SE2d 31) (2017) (holding that "a charge under OCGA § 16-5-3 (a) was not warranted" because the defendant "admitted that he intentionally shot the victim"). Much like "[t]he intentional use of a gun[,] the deadly force of which is known to all," the force involved in strangling a person to the point of unconsciousness, tying cloth

---

[6] The fact that Wynn tied the cloth around Ware's neck after Ware had passed out was not slight evidence that Wynn believed Ware was already dead and thus that Wynn did not intend to kill him because Wynn testified that he believed Ware was only "knocked out" and not dead when he tied the cloth around Ware's neck and hands.

tightly around that person's neck, and then tying the person's hands in a way designed to prevent that person from relieving tension from the neck restraint "is simply inconsistent with the lack of intent to kill which is a prerequisite in involuntary manslaughter." *Harris v. State*, 272 Ga. 455, 457 (3) (532 SE2d 76) (2000) (citation and punctuation omitted). Further, because the evidence at best supported a finding that Wynn intentionally strangled Ware in self-defense, "the crimes were either committed as charged or not committed at all, and there was no evidence that [Wynn] was committing a non-felonious unlawful act," as required by OCGA § 16-5-3 (a). *Stepp-McCommons v. State*, 309 Ga. 400, 404 (2) (b) (845 SE2d 643) (2020). Accordingly, Wynn has not shown that the trial court plainly erred in failing to instruct the jury on involuntary manslaughter.

4. Wynn argues that the trial court erred in failing to instruct the jury to disregard allegedly improper legal testimony offered by Detective Scott Demeester, who investigated the homicide, both when Detective Demeester offered the testimony and

22

when the State referenced the testimony in closing argument. We disagree.

At trial, the State sought to rebut Wynn's justification defense by showing that he was not the victim of a forcible felony. To that end, the State asked Detective Demeester to explain the offenses of aggravated battery, misdemeanor battery, and simple battery. After Detective Demeester testified that "aggravated battery can be losing a member, losing a finger, losing an eye, losing a tooth, you know, being shot, losing your liver," Wynn objected that Detective Demeester was giving improper legal testimony. The court overruled the objection but told the jury, "I will instruct you as to what the law is at the conclusion of this case." Detective Demeester then testified that misdemeanor battery "mean[s] a visible injury like a bloody lip, a black eye, bruising," and that "simple battery would be . . . like the threat of an assault." Detective Demeester also testified that, when meeting with Wynn following the incident, he did not observe any "visible injuries, abrasions, lacerations, or bruising" on Wynn other than a minor abrasion on Wynn's shoulder

23

and a bumped or scraped knee.

Outside the presence of the jury, Wynn objected again that Detective Demeester was giving improper legal testimony about statutory requirements and asked "that the court instruct the prosecutor to ask the witness factual questions only and not legal questions, questions where he's defining what this statute is or what this offense is." The trial court sustained the objection, noting that it would not permit Detective Demeester to testify about what legal conclusions the evidence would support. Wynn did not ask the court to strike Detective Demeester's testimony about the law or request a curative instruction, and the court did not tell the jury that the objection was sustained.

During closing arguments, the State reminded the jury that Detective Demeester "did not see any marks" on Wynn. When the State argued that "there's no evidence that [Wynn] was the victim of a forcible felony," and, "[a]t most, it was a misdemeanor offense," the court sustained Wynn's objection but did not take further action. The State then argued that Detective Demeester's testimony showed

24

that "at most [Ware committed] a minor offense" because "[Wynn] didn't have any injuries that would have risen to the level of felony assault."

Because Wynn never requested a curative instruction for the jury to disregard Detective Demeester's testimony about the law, we review his argument for plain error. See *Franklin v. State*, 306 Ga. 872, 876 (2) (834 SE2d 53) (2019). Wynn has not carried his burden to show plain error.

Considering the issue in the context of the trial as a whole, we discern no need for a curative instruction specifically directing the jury to disregard Detective Demeester's legal testimony. Although Wynn is correct that Detective Demeester's testimony included "incorrect statement[s] of law," the court specifically instructed the jury during Detective Demeester's testimony that the court, not Detective Demeester, was responsible for instructing the jury on the law. Moreover, when charging the jury that deadly force could be used in self-defense to prevent the commission of a forcible felony, the court correctly defined "forcible felony" as "any felony which

25

involves the use o[r] threat of physical force or violence against any person." While the court did not expressly tell the jury to disregard Detective Demeester's legal definitions, the court's instructions, considered together, amounted to such a charge.

Further, Wynn's argument fails on the second prong of plain-error review. We have held that, "[w]here the objection to the prejudicial matter is sustained, the court has no duty to rebuke counsel or give curative instructions unless specifically requested by the defendant." *Stephens v. State*, 307 Ga. 731, 734 (1) (a) (838 SE2d 275) (2020). Accordingly, the alleged error was not "clear or obvious under current law." *Simmons v. State*, 299 Ga. 370, 374 (2) (788 SE2d 494) (2016) (citation and punctuation omitted). This enumeration of error therefore fails.

5. Wynn challenges a portion of the trial court's self-defense jury charge regarding the use of excessive force. In relevant part, the court charged the jury as follows:

> A person is justified in using force against another person when and to the extent that he reasonably believes that such force is necessary to defend himself against the

other's imminent use of unlawful force. A person is justified in using force that is intended or likely to cause death or great bodily harm only if that person believes that such force is necessary to prevent death or great bodily injury to himself or to prevent the commission of a forcible felony.

. . .

[A] person is not justified in using force if that person initially provokes the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon the assailant; is attempting to commit, or is committing, aggravated assault; or was the aggressor.

. . .

[T]he use of excessive or unlawful force while acting in self-defense is not justifiable, and the defendant's conduct in this case would not be justified if you find that the force exceeded that which the defendant reasonably believed was necessary to defend against the victim's use of unlawful force, if any.

. . .

*When the force used exceeds that necessary for self-defense, the law considers the defender to be the aggressor. Self-defense is a lawful act, but if excessive force is used, the act becomes unlawful.*

(Emphasis supplied.) On appeal, Wynn argues that the court erred in including the italicized language in its jury charge. Wynn objected to this language at the charge conference and again after the court charged the jury, preserving the issue for ordinary review on appeal. "When determining whether a charge is erroneous, we

27

look to the charges given as a whole." *Grimes v. State*, 296 Ga. 337, 343 (1) (b) (766 SE2d 72) (2014).

Here, we conclude that the trial court did not err in giving the self-defense jury charge. We have held that, because "[a] homicide is not justified if the force used by the defendant exceeds that which a reasonable person would believe was necessary to defend against the victim's unlawful act," a defendant who "use[s] excessive force . . . in response to the victim['s use of force]" is not justified. *Nelson v. State*, 283 Ga. 119, 120 (1) (657 SE2d 201) (2008). The self-defense charge here adequately captured this principle of law. Although the challenged portion of the jury charge failed to specify that only force exceeding "that which a reasonable person would believe was necessary" would make a person the aggressor, id., the portion of the charge immediately preceding the challenged portion included this language. Specifically, the court stated that "the defendant's conduct in this case would not be justified if you find that the force exceeded *that which the defendant reasonably believed was necessary* to defend against the victim's use of unlawful force."

28

(Emphasis supplied.)   Thus, the instruction, when viewed as a whole, was proper.  See *Hill v. State*, 290 Ga. 493, 497-498 (5) (722 SE2d 708) (2012) (rejecting a challenge to a portion of a self-defense charge providing that, "[w]here the force used exceeds that necessary for defense of the person, the law will consider the defender the aggressor," because the charge as a whole encompassed the "reasonable belief" standard (punctuation omitted)).

Wynn raises two arguments as to why the excessive-force charge was erroneous, but neither is persuasive.  First, Wynn argues that the instruction required the jury to find him guilty of the charged offenses if it found that he used excessive force at any point during the incident.   However, this argument misconstrues the excessive-force charge, which did not instruct the jury to find Wynn guilty of a charged offense if it found that he used excessive force but rather to reject Wynn's justification defense if the jury found that the force he used was unreasonable and excessive.

Second, Wynn argues that the charge would have prevented the jury from acquitting him "even if it found that Wynn only used

29

excessive force at the beginning of the combat but later used reasonable, justifiable force when he ultimately killed Ware." This argument, too, is misguided, based on the record evidence. The only evidence as to the sequence of events leading to Ware's death came from Wynn's testimony. Wynn claimed that Ware was the initial aggressor, that Ware was going to kill him, and that he responded by strangling Ware to unconsciousness and then tying Ware's neck and hands. On these facts, there was no basis for finding that Wynn initially responded with unreasonable force but later used reasonable force to kill Ware. As described in Division 3 above, Wynn's description of his own conduct was inconsistent with a finding that he used force without an intent to kill Ware. Thus, if the jury credited Wynn's claim that Ware was the initial aggressor, it could have found only that Wynn reasonably or unreasonably responded with deadly force. There was no room for the jury to find that Wynn initially responded to Ware's aggression with unreasonable force and later used reasonable force to kill him. Accordingly, this enumeration of error lacks merit.

6. Finally, Wynn argues that he is entitled to a new trial due to the cumulative prejudicial impact of the trial court's errors. See *State v. Lane*, 308 Ga. 10, 14 (1) (838 SE2d 808) (2020) (holding that "Georgia courts considering whether a criminal defendant is entitled to a new trial should consider collectively the prejudicial effect of trial court errors"). A cumulative error analysis, however, requires an appellant to show that "at least two errors were committed in the course of the trial." *Flood v. State*, 311 Ga. 800, 808 (2) (d) (860 SE2d 731) (2021) (citation and punctuation omitted). Here, there is no basis for evaluating the cumulative effect of errors because we have identified only one error and rejected Wynn's other claims. See id. at 808-809 (2) (d).

*Judgment affirmed. All the Justices concur, except Warren, J., who concurs in judgment only as to Division 4.*

Decided June 1, 2022.

Murder. Fulton Superior Court. Before Judge Cox.

*Jackie L. Tyo*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Juliana Y. Sleeper, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.