309 Ga. 252
FINAL COPY

S20A0167. DUNBAR v. THE STATE.

MELTON, Chief Justice.

Following a jury trial, Shanika Dunbar appeals her convictions for the murder of Theron Robbins and possession of a firearm during the commission of a felony.[1] Dunbar contends that the evidence presented at trial was insufficient to support the verdict, the trial court erred by admitting an irrelevant AK-47 rifle into evidence, and the trial court erred by allowing testimony regarding the withdrawal of consent to search Dunbar's home. For the reasons set forth below,

---

[1] A Chatham County grand jury indicted Dunbar on September 21, 2016, for malice murder, felony murder predicated on aggravated assault, cruelty to children in the first degree, and possession of a firearm during the commission of a felony. At a jury trial that took place from September 25 to 28, 2018, Dunbar was acquitted of the child cruelty count and found guilty of all remaining counts. On October 17, 2018, the trial court sentenced Dunbar to life without the possibility of parole for malice murder plus five consecutive years for possession of a firearm during the commission of a felony. The felony murder count was vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993). On October 22, 2018, Dunbar filed a motion for new trial, which she subsequently amended on April 19, 2019. The trial court denied the motion on July 15, 2019. Dunbar filed a timely notice of appeal, and her case was docketed to the term of this Court beginning in December 2019 and submitted for a decision on the briefs.

we affirm.

1.  Dunbar contends that the evidence presented at trial does not support her convictions, but instead supports a finding that she acted in self-defense.  We disagree.

When evaluating the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).  "This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence."  (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013).

Viewed in this light, the evidence shows that, on the night of June 9, 2016, Johnnie Lovett drove Robbins and his ten-year-old son to the home of Benny Glaze, which was located in Chatham County.

Robbins and his son waited in the car, while Lovett went into Glaze's back yard to sell Glaze some marijuana.

Meanwhile, Dunbar drove up and parked just past Lovett's car. Dunbar, who was upset with Robbins for pointing a gun at her sister (the mother of Robbins's son) several days prior, got out of her vehicle and approached Lovett's car. Robbins got out of Lovett's car, and he and Dunbar began arguing. Dunbar testified that, when she confronted Robbins about the incident with her sister, Robbins replied, "I don't know what the f*** you talking about. I don't give a f*** about none of y'all b******s and I'll kill all y'all b******s."

Lovett and Glaze heard Robbins and Dunbar arguing. They came out of the back yard to see Robbins and Dunbar shoving each other. Lovett tried to separate the two, but Robbins pushed him away. Shortly thereafter, Dunbar turned and walked back toward her vehicle. According to Robbins's son, after Dunbar took a few steps, she stopped, turned around, and shot Robbins twice — once in the chest and once in the head.

Nearby neighbors heard Robbins' and Dunbar's heated

argument. As they debated whether to call 911, they heard a gunshot, followed by "F*** you, n*****," and then another gunshot. They called 911 and rushed out to help Robbins. By the time they reached him, Dunbar, Lovett, and Glaze had all fled. Despite a neighbor's attempt to administer aid, Robbins died before police arrived on the scene.

After shooting Robbins, Dunbar pulled Robbins's son from Lovett's car and drove him to the home of one of his other aunts, who lived around the corner. She dropped him off and told him not to tell anyone what had happened. When interviewed by the police later that evening, Dunbar denied having seen Robbins that night, denied being involved in the shooting, and denied having ever felt threatened by Robbins.

During the ensuing investigation, the police obtained Dunbar's and Glaze's phone records, which showed numerous phone calls between Dunbar and Glaze in the days leading up to the murder, including a call just moments before the murder. Dunbar also called Glaze just minutes after the murder, and again about 20 minutes

later. Additionally, phone records showed a call from Dunbar to Lovett roughly 20 minutes after Robbins's murder. The police also obtained Glaze's Facebook records, which contained a conversation between him and a friend that took place a few days after the murder, in which Glaze says "Dunbar" was the shooter.

At trial, Dunbar asserted that she shot Robbins in self-defense, after Robbins pulled a gun from his waistband during their argument. Robbins's son acknowledged that his father carried a gun in his waistband, but testified that Robbins never pulled his gun during the argument. Dunbar claimed to have blacked out after the first shot, and did not remember taking a second shot at Robbins. After going home, her husband took the gun from her. The murder weapon was never recovered.

Based on the foregoing, we conclude that the evidence was sufficient to enable the jury to find beyond a reasonable doubt that Dunbar was guilty of the crimes for which she was convicted. See *Jackson*, 443 U.S. at 319 (III) (B). See also *Goodson v. State*, 305 Ga. 246, 248 (1) (b) (824 SE2d 371) (2019) ("Questions about the

existence of justification are for the jury to resolve, and the jury may reject any evidence in support of a justification defense and accept evidence that a shooting was not done in self-defense.").

2.  Dunbar contends that the trial court abused its discretion by admitting into evidence an AK-47 rifle and ammunition, which were not connected to Robbins's murder.  We disagree.

We review a trial court's admission of evidence for an abuse of discretion.  See *Taylor v. State*, 302 Ga. 176, 180 (805 SE2d 851) (2017).  The record shows that the trial court initially ruled that the AK-47 rifle and the ammunition for various types of handguns, which were found during a search of Dunbar's home conducted four days after the murder, were inadmissible, as they were not relevant to any issue in the case.  See OCGA § 24-4-401.  During Dunbar's cross-examination, the prosecutor asked Dunbar what happened to the gun she used to shoot Robbins.  Dunbar said that she did not know what had happened to the gun.  She testified that her husband took it from her, because she "never wanted to see a gun in [her] life."  Immediately following this testimony, the prosecutor sought

to introduce the AK-47 rifle and the ammunition to impeach Dunbar's statement. Dunbar's counsel argued that the items were not relevant and that their prejudicial effect outweighed their probative value. Over Dunbar's objection, the trial court ruled the items admissible for impeachment purposes.

The trial court did not abuse its discretion in allowing the State to introduce the AK-47 rifle and ammunition for impeachment purposes. In light of Dunbar's testimony that her husband had removed the murder weapon from the home because she "never wanted to see a gun in [her] life," the State was entitled to show that — just days later — an AK-47 rifle and ammunition for various types of handguns were found in Dunbar's home and she was aware of their presence. See OCGA § 24-6-621 ("A witness may be impeached by disproving the facts testified to by the witness."). See also *Taylor*, 302 Ga. at 180 (3) ("[T]he State ha[s] a right to a thorough and sifting cross-examination of appellant's direct testimony.").

Dunbar's reliance on *Nichols v. State*, 282 Ga. 401, 405 (2) (651

SE2d 15) (2007), for a different result is misplaced. Not only was *Nichols* decided under Georgia's old Evidence Code, but our ruling in that case specifically addressed the admissibility of evidence introduced as the res gestae of an arrest when that evidence was wholly unrelated to the crime in question. Because Dunbar's trial was held after adoption of Georgia's current Evidence Code, and as the evidence in this case was introduced not as the res gestae of an arrest, but for impeachment purposes, our holding in *Nichols* is inapposite.

And although Dunbar argues that, even if admissible for impeachment purposes, the evidence should have been excluded pursuant to OCGA § 24-4-403 ("Rule 403"),[2] "the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly." (Citation and punctuation omitted.) *Venturino v. State*, 306 Ga. 391, 395 (2) (b) (830 SE2d 110) (2019).

---

[2] OCGA § 24-4-403 states: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Under the circumstances of this case, we cannot say that the trial court abused its discretion in determining that the probative value of the evidence outweighed the danger of unfair prejudice. Dunbar asserts that the admission of this evidence created "a subconscious suggestion of propensity for violence." However, it was only after Dunbar herself opened the door for its admission that the State introduced the evidence to contradict Dunbar's statement that she had never wished to see a gun again. And, during its closing argument, the State only referred to the AK-47 rifle and ammunition in the context of Dunbar's truthfulness. At no time did the State suggest to the jury that the evidence demonstrated Dunbar's propensity for violence, and the trial court gave a limiting instruction that the evidence was only to be used for impeachment purposes.

3. Finally, Dunbar claims that the trial court erred by allowing the State to elicit testimony about the withdrawal of consent to

search her home.[3]  She asserts that this testimony violated her right against self-incrimination protected by the Fifth Amendment of the United States Constitution and Article I, Section I, Paragraph XVI of the Georgia Constitution ("Paragraph XVI").  We discern no error.

At trial, Dunbar objected to the testimony regarding withdrawal of consent to search her home on grounds of hearsay,[4] relevancy, and improper character evidence.  Because she did not object to the trial court on the constitutional grounds she now raises, we review this evidentiary claim only for plain error.  See OCGA § 24-1-103 (a), (d) (requiring timely objections to include the specific grounds, but allowing courts to "tak[e] notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court").  See also *Anthony v. State*, 302 Ga. 546, 549 (II) (807 SE2d 891) (2017) ("In order to preserve an objection for

---

[3] On the night of the murder, when police interviewed Dunbar at her home, she initially consented to a search, but her husband refused consent. After that, neither Dunbar nor her husband signed the consent-to-search forms, and the detective who testified referred to this as a "withdrawal" of consent.

[4] Dunbar's husband did not testify at trial.

appellate review, the specific ground of the objection must be made at the time the challenged evidence is offered."). It is not enough that Dunbar raised the constitutional grounds in her motion for new trial. At this stage, the assertion is untimely. *State v. Herrera-Bustamante*, 304 Ga. 259, 263 (2) (a) (818 SE2d 552) (2018) (applying plain error review where argument was raised for the first time in motion for new trial).

Under plain error review, there must exist a clear or obvious error, which has not been affirmatively waived by the appellant, and which affects the appellant's substantial rights. See *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011). If such error exists and it "seriously affects the fairness, integrity or public reputation of judicial proceedings," the appellate court has the discretion to remedy the error. Id. (Citation and punctuation omitted.)

The record does not indicate that Dunbar affirmatively waived this argument. Consequently, we turn to whether the trial court committed a "clear or obvious" error. It is well established that the Fifth Amendment's protection against self-incrimination is limited

to *testimonial* evidence. See *Doe v. United States*, 487 U.S. 201, 207 (108 SCt 2341, 101 LE2d 184) (1988). As law enforcement's request to search Dunbar's home did not seek testimonial evidence from Dunbar, her Fifth Amendment argument is unavailing. See id.; see also, e.g., *Gilbert v. California*, 388 U.S. 263, 266-267 (87 SCt 1951, 18 LE2d 1178) (1967); *Schmerber v. California*, 384 U.S. 757, 760-765 (86 SCt 1826, 16 LE2d 908) (1966).

However, Paragraph XVI of the Georgia Constitution does not limit its protections to testimonial evidence. See *Bell v. State*, 293 Ga. 683, 686 (3) n.4 (748 SE2d 382) (2013). Dunbar relies on our holding in *Elliott v. State*, 305 Ga. 179 (824 SE2d 265) (2019), to argue that gathering evidence through a search of her home equates to compelling Dunbar to be a witness against herself, and admission of her refusal to consent to that search, therefore, violates her right against self-incrimination. But, *Elliott* is of no help to Dunbar. While it is true that *Elliott* held that admission of a refusal to consent to a breath test violated the defendant's right against self-incrimination under Paragraph XVI, our holding did not extend to

the refusal to consent to *any* search as Dunbar indicates. *Elliott* held that, because Paragraph XVI protects against self-incrimination through certain types of compelled acts, admission of the refusal to consent to a breath test (which requires the compelled act of deep-lung breathing) would violate the defendant's constitutional right against self-incrimination. See *Elliott*, 305 Ga. at 189 (III), 209 (IV). *Elliott* and our underlying decision in *Olevik v. State*, 302 Ga. 228 (806 SE2d 505) (2017), were careful to distinguish that their scope does not extend to all types of searches, but is limited to breath tests. Thus, Dunbar fails to show that the trial court's admission of this testimony was plain error, as her argument would require extending the existing precedent embodied in *Elliott* and *Olevik* beyond its current scope. See *Herrera-Bustamante*, 304 Ga. at 264 (2) (b) ("The current law considered is the law at the time of appellate review rather than at trial, but an error is not plain under current law if a defendant's theory requires the extension of precedent.") (citations and punctuation omitted).

Given that Dunbar cannot point to controlling precedent

showing that the search of her home — and, by extension, her withdrawal of consent to search — falls within the protections against self-incrimination embodied in Paragraph XVI, we cannot conclude the trial court committed "clear or obvious" error.[5]

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 29, 2020.
Murder. Chatham Superior Court. Before Judge Bass.
*David T. Lock*, for appellant.
*Meg E. Heap, District Attorney, Jennifer L. Parker, Christine S. Barker, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.

---

[5] Dunbar does not argue that the trial court's admission of testimony regarding withdrawal of consent violates her right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, so we do not address it here. But see *United States v. Runyan*, 290 F3d 223, 249 (5th Cir. 2002).