320 Ga. 66
FINAL COPY

S24A0705. RANA v. THE STATE.

BOGGS, Chief Justice.

Appellant Tahreem Rana challenges his convictions for malice murder and other crimes in connection with the shooting death of Vernecia Woodard.[1] Appellant contends that the trial court erred in

---

[1] The crimes occurred on August 22, 2014. On November 21, 2014, a Fulton County grand jury indicted Appellant for the malice murder, felony murder (based on aggravated assault), and aggravated assault of Woodard, arson of lands, concealing the death of another, tampering with evidence, four counts of the violation of oath by a public officer, possession of a firearm during the commission of a felony, and pandering. At a trial from October 6 to October 12, 2016, a jury found Appellant guilty on all counts of the indictment. On November 1, 2016, the trial court sentenced Appellant to life in prison without the possibility of parole for malice murder, to five consecutive years for arson of lands, to 12 consecutive months for tampering with evidence, to five consecutive years for two counts of violation of oath by a public officer, to five probated years for one count of violation of oath by a public officer, to five probated years for the possession offense, and to 12 concurrent months for pandering. The felony murder count was vacated by operation of law, and the trial court merged the aggravated assault count, the count of concealing the death of another, and one count of violation of oath by a public officer for purposes of sentencing. Although there may have been a merger error with respect to the count of concealing the death of another, which the trial court purported to merge with the count of tampering with evidence, we decline to address that issue sua sponte because the State has not challenged this purported merger and any error benefited the defendant. See *Dixon v. State*, 302 Ga. 691, 697-698 (808 SE2d 696) (2017) (explaining why we ordinarily decline to exercise our discretion to correct merger error favoring a defendant).

instructing the jury that the charge on accident was limited to the crime of aggravated assault and thus not applicable to the murder counts of the indictment; erred in failing to charge on the defense of habitation; and erred by giving the jury an incomplete charge on justification. For the reasons that follow, we conclude that any error in limiting the defense of accident to the crime of aggravated assault was harmless; that the trial court did not err in refusing to charge the jury on the defense of habitation; and that Appellant has failed to establish plain error with regard to his claims that the trial court erred in omitting certain jury instructions on justification. Accordingly, we affirm Appellant's convictions.

1. The evidence presented at trial showed that on August 22, 2014, Woodard was living in a motel in Tucker with Uniquah Arnold. Arnold testified that Woodard got up about 8:00 a.m. that

---

Appellant filed a motion for new trial on November 10, 2016, which he amended with new counsel on May 30, 2019, and July 14, 2023. After an evidentiary hearing on July 20, 2023, the trial court denied Appellant's motion for new trial, as amended, on November 15, 2023. Appellant filed a timely notice of appeal, and the case was docketed to this Court's April 2024 term and submitted for a decision on the briefs.

day, and went outside "to go to try to come up with the money" to pay for her share of the motel room. According to Arnold, Woodard was going to get the money by finding someone to pay her for sex. About 20 to 30 minutes later, Woodard called Arnold and told her that she "had caught a date" and would be back in about a half hour. Arnold subsequently called Woodard several times that day, but never was able to reach her again.

About 4:00 p.m. on August 22, an employee of the City of Hapeville saw a fire at a city dump on Elm Street where yard waste was recycled and went to investigate. He saw the body of a female that was on fire and called the Hapeville Police Department. The body was later determined to be Woodard.

Agent Josh Ellis of the Georgia Bureau of Investigation, a crime scene specialist, arrived at the crime scene about 6:30 p.m. on August 22. Agent Ellis testified that he located a .40-caliber shell casing at the crime scene. He also found a $20 bill in Woodard's pants pocket and testified that Woodard had a significant head injury. Woodard, who was five feet, eight inches tall, had suffered

burns to her back and legs. The medical examiner testified that she had been shot twice near the same location on the front part of the top of her head, creating a large, deep wound that caused "a whole bunch of . . . destruction" and would have rendered Woodard "unconscious immediately." The medical examiner added that, when the bullets struck the top of Woodard's head, they were traveling "front to back" and "slightly downward" and that Woodard's wounds were consistent with her being on her knees when she was shot. Woodard also had two other gunshot wounds, a penetrating wound to the right forearm and a graze wound to the back of the head that did not penetrate the skull. According to the medical examiner, the cause of Woodard's death was the gunshot wounds to the top of the head.

Law enforcement officials did not recover Woodard's cell phone but did obtain her phone records. Cell site location data showed that at 11:01 a.m. on August 22, there was a call between Appellant's cell phone and Woodard's cell phone that originated from a cell tower near Appellant's home. There was another such call at 11:43 a.m.,

4

this time originating from a cell tower near the motel where Woodard lived. The cell site location data also showed that at 12:10 p.m. on August 22, Woodard called Arnold from a location close to Appellant's house. Moreover, the evidence showed that Appellant, who was a City of Atlanta police officer, lived in Hapeville, "between a half mile and one mile" from where Woodard's body was found and about 22 miles from the motel where Woodard lived.

On the morning of August 27, 2014, Appellant was stopped by City of Hapeville law enforcement officials for a traffic violation. A detective told him that he had been stopped for a "tag violation" and that the detective was interested in talking to him about a homicide because Appellant's "phone number had been identified as a last known contact of [Woodard]." Appellant agreed to be interviewed by law enforcement officials. During the interview, law enforcement officials told Appellant that his "number was the last number to call [Woodard's] phone." Appellant admitted to texting Woodard about meeting with her for the purpose of paying her for sex but said that she lived too far away from him and that he called her and told her

so. Appellant denied that he ever met with Woodard. Appellant was released after the interview, which ended about 11:30 a.m., but his car was impounded and a warrant to search it was obtained. On August 28, 2014, law enforcement officials conducted a search of Appellant's vehicle and found a .40-caliber Glock pistol issued by the City of Atlanta Police Department in the pocket of the driver's door. In addition, a GPS unit in Appellant's vehicle showed that on August 22, Woodard's address had been entered into the system. In a search of Appellant's home, law enforcement officers recovered two .40-caliber shell casings and two used condoms.

After his interview with law enforcement officials on August 27, Appellant called one of his supervisors at work and said that he would not be at work that day. In a second call to the same supervisor about 6:00 p.m. that same day, Appellant told the supervisor that "they got me for murder" and that he had "to get out of this country." On August 27, at 9:55 p.m., Appellant purchased a one-way ticket to Mexico with cash for a flight departing from the

6

Atlanta airport on the morning of August 28. Appellant, however, was arrested before he boarded the flight.

A GBI firearms examiner testified that Appellant's Glock pistol fired the .40-caliber cartridge case found by Woodard's body, as well as two .40-caliber cartridge cases found in a trash can in Appellant's bedroom. In addition, a forensic scientist with the GBI testified that one of the condoms found in Appellant's home contained DNA from Woodard and Appellant, while the other contained DNA from Woodard and from a second person who could not be identified due to the scarcity of DNA material. The scientist also testified that, although Woodard's and Appellant's DNA were found on the handle of Appellant's .40-caliber Glock pistol, Woodard's DNA was the primary profile found on the handle and was the only DNA profile found on the trigger of the pistol.

Appellant testified in his own defense at trial. Appellant recounted that on August 22, he drove his car to the motel where Woodard was living, picked her up, and drove her back to his house. According to Appellant, he and Woodard agreed to a price of $100

for sex, and after their sexual interaction, they got back in his car so that he could drive her home. As Appellant was driving, Woodard demanded more money from him, but Appellant told her that they had agreed on a price and that he would not pay her any more money. Appellant testified that Woodard became agitated and threatened to have a friend of hers named "Scarface" "take care of [him]." Appellant turned left on Elm Street, the street on which Hapeville's yard waste recycling facility is located, pulled over to the curb, and told Woodard to get out of his car. She refused, saying that he was "going to pay [her] more money." She then took his wallet out of the center console and "start[ed] going through it." Appellant "snatched" the wallet from her, causing Woodard to become "really irate."

Appellant testified that Woodard then opened the glove compartment, saw that a firearm was in it, and "grab[bed] it." Woodard pointed the gun at Appellant, who asked her to give it back. She refused and told him to keep driving. Appellant drove down Elm Street to where it dead-ended and parked the car. Woodard told him

8

to get out of the car, and Appellant told her that she could have the wallet and the car. Appellant got out of the car and began backing away from it, with his hands up; Woodard also got out of the car and began following Appellant, while pointing the gun at him. Appellant told Woodard that she did not "have to shoot [him]" and that she could have the car and everything in it. Appellant testified that he felt "like [he was] going to die" and that he "decided that [he had] to do something or [he was] going to get shot." According to Appellant, he lowered his hands and grabbed the handle of the gun, adding that Woodard's hand was on the trigger. As they both turned to the left, the gun "[went] off." Appellant testified that, after that first shot, Woodard was still "standing up." Appellant "immediately snatch[ed] away" the gun and fired "off two more rounds." Woodard was then on the ground. Appellant added that, "[a]fter the shots [had] been fired and I realized that she'[d] been shot, and [I was] fine, in my mind [I was] panicking." Woodard, according to Appellant, had been shot in the head and was dead. Appellant then got in his car and went home. He was "in a state of shock" and did not know what to

9

do. He decided that he "need[ed] to go back and try to cover up the body," so he got a gas can and drove back to the scene, where he set Woodard's body on fire "to try to cover up the fact that she had been shot and that [he] was there." Appellant then went home. Appellant denied that he ever placed his gun in Woodard's hand or attempted to gather her DNA and put it on the gun.

Appellant acknowledged that, in his interview with law enforcement officials on August 27, he lied about his interactions with Woodard. He testified that he did so because, even though he was stopped for only a traffic violation, the officers impounded his car, told him that he could not go back to it, and were acting like "they already thought that I was guilty."

On cross-examination, Appellant acknowledged that he burned Woodard's body because he did not want her to be identified. Appellant added that, when the first shot was fired, he "guess[ed]" the gun was pointed at her head, but that he did not remember at what part of her head it was pointed. The prosecutor reminded Appellant that the medical examiner testified that Woodard had

gunshot wounds to the front and back of her head and asked Appellant if the first shot hit Woodard in the front or back of the head. Appellant responded that he did not remember and said that the gun "was pointed at her." The prosecutor again asked Appellant if the gun was pointed at the front or back of Woodard's head when the first shot was fired, and Appellant said, "[t]he front of her head"; that, after that shot, Woodard was still standing; and that he still perceived her as a threat. When asked how Woodard was still standing and a threat to him in light of the medical examiner's testimony that the injuries to the front of Woodard's head were catastrophic, Appellant said, "[t]o me [she was] still a threat. I [did not] know what had happened at that point." Appellant added that after he got the gun from Woodard, "the other two shots [went] off instantaneously right after one another"; that he pulled the trigger because he "thought [he] was still in danger"; that they were standing about two feet away from each other; and that he was holding the gun at Woodard's neck level. According to Appellant, Woodard fell down after those two shots. He acknowledged that he

11

is five feet, ten inches tall; that Woodard was five feet, eight inches tall; that he had the gun pointing about neck high on Woodard; and that to shoot Woodard in the front of the head while facing her, he would have had to shoot at an upward angle.

2. Appellant contends that the trial court erred in limiting his accident defense to the aggravated assault count of the indictment when instructing the jury. We conclude that, even if the trial court erred, the error was harmless.

(a) During the charge conference, the trial court explained that it would limit the defense of accident to the aggravated assault count of the indictment because Appellant testified that the first gunshot occurred when the "victim came at [him] with the gun, he reached, grabbed the gun, they went left, [and] the gun went off." The court noted that Appellant testified that Woodard was standing after this gunshot, that this gunshot could have caused the graze wound that Woodard suffered, and that Appellant's testimony was some evidence that the assault resulted from an accident. However, the court added that the first gunshot could not have caused the head

12

wound because the medical examiner had testified that the head wound "would have immediately put [Woodard] on the ground." In its charge to the jury, the trial court limited the defense of accident to aggravated assault, and Appellant objected to the court doing so. On appeal, Appellant contends that because he testified on cross-examination that the first shot was to the front of Woodard's head and because the medical examiner testified that this shot would have killed the decedent, he was entitled to have his defense of accident apply to the murder counts of the indictment.[2]

(b) "To authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge," but "the failure to give a requested charge which is authorized by the evidence can be harmless error." *McClain v. State*, 303 Ga. 6, 9 (810 SE2d 77) (2018) (cleaned up). "And a jury-instruction error is

---

[2] We consider this enumeration only with regard to its application to the malice murder count of the indictment. Because the jury found Appellant "guilty of malice murder, the felony murder count was vacated by operation of law," and "[a]ny enumerated error with regard to jury instructions on felony murder . . . is therefore moot." *Williams v. State*, 313 Ga. 325, 332 (869 SE2d 389) (2022).

harmless when it is highly probable that the error did not contribute to the verdict." Id. (cleaned up). Here, we need not decide if the trial court erred in failing to charge that accident was a defense to malice murder, as it is highly probable that "an accident . . . instruction would not have changed the outcome of the trial." Id.

In *McClain*, we held that any error by the trial court in failing to charge on accident and misfortune was harmless because the jury found the defendant guilty of malice murder after it was properly charged on that crime, including the element of malicious intent. Id. at 9-10. We reasoned:

> To accept [the defendant's] theory of accident, the jury would have had to believe his account of the shooting—that [the victim] accidentally pulled the trigger and shot herself while he was trying to wrest the gun away from her. It is undisputed, however, that the trial court properly instructed the jury on the elements of malice murder and the requisite malicious intent, an intent that is absolutely incompatible with [the defendant's] theory of accident. When the jury found [the defendant] guilty of malice murder, it necessarily must have discredited his account of the shooting.

Id. Accord *Spence v. State*, 307 Ga. 520, 526 (837 SE2d 334) (2019)

14

(holding that, under plain-error review, even assuming the trial court committed an obvious error in failing to charge on accident, the defendant "failed to carry her burden of demonstrating that any such error likely affected the outcome of her case" because "where, as here, the jury was fully charged on the State's burden to prove every element of the crime of murder — including intent — and the jury finds the defendant guilty of malice murder, the jury could not have believed the victim's death to be the result of an act committed in the absence of criminal intent").

At Appellant's trial, the trial court fully charged the jury on the elements of malice murder, including intent, and the jury found Appellant guilty of malice murder, discrediting his account of the shooting. In addition, the jury found Appellant guilty of aggravated assault, meaning that the jury rejected his testimony that the first shot that struck Woodard was the result of an accident. Under these circumstances, we conclude that any error in the trial court's refusal to charge that Appellant's accident defense applied to the malice murder count of the indictment was harmless. See *Spence*, 307 Ga.

15

at 526-527; *McClain*, 303 Ga. at 9-10.

3. Appellant contends that the trial court erred in refusing to charge the jury on the defense of habitation. We disagree.

OCGA § 16-3-24.1 defines a "habitation" to include a "motor vehicle," and under OCGA § 16-3-23, "[a] person is justified in threatening or using force against another" in defense of habitation "when and to the extent he or she reasonably believes that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation." Moreover, a person is justified in using *deadly* force or force "intended or likely to cause . . . great bodily harm" in defense of a habitation only in three circumstances. See OCGA § 16-3-23 (1)-(3). Appellant relies on the third circumstance, which permits the use of deadly force if "[t]he person using such force reasonably believes that the entry is made or attempted for the purpose of committing a felony therein and that such force is necessary to prevent the commission of the felony." OCGA § 16-3-23 (3).

In light of this statutory language, we have held that "[w]here

16

there is no evidence that the victim was attempting to enter or attack the habitation at the time he was injured by the defendant, the defense of habitation is not available," *Coleman v. State*, 286 Ga. 291, 298 (687 SE2d 427) (2009), and that for the defense to apply when the "habitation" is a motor vehicle, "there would need to be evidence that [the victim] was entering or attempting to enter [the defendant's car] at the time" the defendant shot the victim, *Walker v. State*, 301 Ga. 482, 486 (801 SE2d 804) (2017). In this case, there is no evidence that Appellant shot Woodard when she was entering or attempting to enter his car. Instead, the evidence shows that Appellant shot Woodard after they had exited Appellant's car and were walking away from it. Accordingly, the trial court did not err in refusing to charge on defense of habitation. See *Walker*, 301 Ga. at 486 (holding that the defendant had shown no error in the trial court's failure to charge on defense of habitation where the evidence showed that the defendant opened the door of his SUV as the victim was walking toward it, "retrieved his gun from inside the SUV, but . . . then closed the door and remained outside [the SUV] during the

17

confrontation with [the victim]"); *Coleman*, 286 Ga. at 298-299 (holding that the defendant's claim that his attorney performed deficiently by failing to request a charge on defense of habitation was without merit on the ground that the defendant shot the victim when they were outside of the defendant's motor vehicle and the victim thus was not in or attempting to enter the defendant's motor vehicle).

4. Appellant contends that, with regard to his justification defense, the trial court erred by failing to charge the jury that the State had the burden of proving beyond a reasonable doubt that the defendant was not justified in using deadly force against Woodard; by failing to define the term "forcible felony"; by failing to charge on the doctrine of a defendant's "reasonable beliefs"; and by failing to charge that he had no duty to retreat.[3] Because Appellant did not

---

[3] The trial court's charge on justification was as follows:

A person is justified in threatening or using force against another person when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself against the other's imminent use of unlawful force. A person is

18

object to the omission of these charges after the jury charge and before the jury retired to deliberate, his claims may be reviewed on appeal only for "plain error." OCGA § 17-8-58 (b). See also *Jivens v. State*, 317 Ga. 859, 861 (896 SE2d 516) (2023) ("[T]o preserve an objection to a jury charge for ordinary appellate review, the defendant must restate his objection after the court gives its instructions and before the jury retires to deliberate.").

To show plain error, Appellant must show that "(1) the alleged error was not affirmatively waived, (2) it was obvious beyond reasonable dispute, and (3) it affected the appellant's substantial rights, which ordinarily means showing that it affected the outcome of the trial." *Whittaker v. State*, 317 Ga. 127, 133 (891 SE2d 849) (2023) (cleaned up).[4] If a defendant makes these showings, "the

justified in using force that is intended or likely to cause death or great bodily harm only if that person reasonably believes that such force is necessary to prevent death or great bodily injury to himself or to prevent the commission of a forcible felony.

[4] In contrast to nonconstitutional harmless error, where the State has the burden to show that it was highly probable that an error did not contribute to the verdict, under the plain-error test, "a defendant has the burden of making an affirmative showing that the error probably did affect the outcome below." *Allen v. State*, 310 Ga. 411, 418 n.6 (851 SE2d 541) (2020) (cleaned up).

appellate court has the discretion to remedy the error only if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." Id. (cleaned up). "Satisfying all four prongs of this standard is difficult, as it should be." *Ruthenberg v. State*, 317 Ga. 227, 231 (892 SE2d 728) (2023) (cleaned up). And if an appellant fails to satisfy any one prong of the plain error test, "we need not address the other prongs of the test." *Burley v. State*, 316 Ga. 796, 803 (888 SE2d 507) (2023).

(a) Appellant's chief complaint is that the trial court plainly erred by failing to charge the jury that the State had the burden of proving beyond a reasonable doubt that the defendant was not justified in shooting Woodard. However, even assuming that the trial court clearly erred in not instructing the jury that the State had the burden to disprove Appellant's justification defense, we conclude that Appellant has failed to carry his burden to show that the error likely "affected the outcome" of his trial.

Here, the only testimony supporting Appellant's justification defense was his own testimony. However, not only was Appellant's

20

testimony self-serving, his "credibility as a witness was undermined by his in-court admission that he lied to the police" and by "his assertions of innocence in [his] prior police interview[ ]." *Holmes v. State*, 311 Ga. 698, 701 (859 SE2d 475) (2021). Appellant's account of the shooting was also significantly undermined by other evidence presented at trial. In this regard, the forensic evidence showed that the two gunshot wounds to Woodard's head were fired from front to back at a slightly downward angle and were consistent with Woodard having been on her knees when shot. In contrast, Appellant claimed that he and Woodard were standing and facing each other when he fired the two shots that killed her. Moreover, he added that he had the gun pointing about neck high on Woodard and acknowledged that, given that he and Woodard were roughly the same height, the fatal gunshots would have had to have been fired at an upward angle. Given these considerations, we conclude that Appellant has failed to carry his burden to show that the trial court's failure to charge on the State's burden to disprove Appellant's justification defense affected the outcome of his trial. Compare

21

*Everett v. State*, 318 Ga. 697, 700-701 (899 SE2d 699) (2024) (even assuming that a portion of the jury charge on justification could have misled the jury to think that there was an exception to the availability of self-defense for the defendant, the error was harmless because "the only testimony supporting [the defendant's] justification defense was his own testimony" and other evidence presented at trial "significantly undermined his credibility and showed that his version of events was untenable"), and *Reese v. State*, 317 Ga. 189, 196 (891 SE2d 835) (2023) (reviewing for plain error the defendant's claim that the trial court erred in failing to charge on justification and holding that the defendant's "self-defense theory was not sufficiently strong that the omission of the instructions likely 'affected the outcome' of his trial"), with *State v. Alvarez*, 299 Ga. 213, 215 (790 SE2d 66) (2016) (concluding that the failure to charge on the State's burden to disprove the defendant's justification defense was plain error, in part because "sufficient evidence was presented from which a jury could find justification" (cleaned up)).

(b) Appellant alleges that the trial court plainly erred by failing to define the term "forcible felony" for the jury.[5] However, although Appellant notes that the trial court failed to define the term "forcible felony" and alleges that his testimony at trial showed that the victim committed several felonies, including aggravated assault, armed robbery, and kidnapping, Appellant makes no legal argument to support the proposition that the trial court erred in failing to define this term. Thus, his plain-error claim based on the failure to give the charge is deemed abandoned. See Supreme Court Rule 22 (1) ("Any enumerated error or subpart of an enumerated error not supported by argument, citations to authority, and citations to the record shall be deemed abandoned."). In addition, even if the claim is not deemed abandoned, it is without merit, as Appellant has cited no controlling authority for the proposition that a trial court's failure to define the term "forcible felony" is error. See *Hill v. State*, 310 Ga. 180, 194-195

---

[5] The trial court instructed the jury that "[a] person is justified in using force that is intended or likely to cause death or great bodily harm only if that person reasonably believes that such force is necessary to prevent death or great bodily injury to himself or to prevent the commission of a *forcible felony*." (Emphasis supplied.)

(850 SE2d 110) (2020) (explaining that "[a]n error is plain if it is clear or obvious under current law" and that "[a]n error cannot be plain where there is no controlling authority on point" and holding that because the defendant "cite[d] no controlling authority for the proposition that the instructions are erroneous," "he cannot show that giving the instructions constituted clear or obvious error" (cleaned up)); *McKibbins v. State*, 293 Ga. 843, 853 (750 SE2d 314) (2013) (holding that the defendant could not show the trial court's failure to define the term "accomplice" for the jury was a clear or obvious error in part because the defendant "point[ed] to no decision in which this Court or our Court of Appeals has found that a trial court erred by failing to define 'accomplice' in connection with such a charge").

(c) In a single sentence of his brief, Appellant notes that the trial court failed to charge on the doctrine of reasonable beliefs. See OCGA § 16-3-21 (a) ("[A] person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she *reasonably believes* that such force is necessary to prevent death

24

or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony." (emphasis supplied)). Appellant, however, makes no specific argument that the trial court erred by failing to give such a charge. Thus, his claim based on the failure to give the charge is deemed abandoned. See Supreme Court Rule 22 (1).

(d) Appellant claims that the trial court plainly erred in failing to charge that he had no duty to retreat before using deadly force. However, Appellant has failed to show an obvious error. When "the issue of retreat is raised by the evidence or placed in issue, the defense is entitled to a charge on the principles of retreat." *White v. State*, 291 Ga. 7, 8 (727 SE2d 109) (2012) (cleaned up). Accord *Whittaker*, 317 Ga. at 133 ("The no-duty-to-retreat instruction is required only when 'the issue of retreat is raised by the evidence or placed in issue.'" (quoting *White*)). Here, during Appellant's testimony, he "was not questioned as to why he did not leave the scene," *White*, 291 Ga. at 9, and the State did not argue he should have retreated. The record thus does not show that the principles of

25

retreat were placed in issue, and, accordingly, the trial court did not commit an obvious error in failing to charge on those principles. See *Whittaker*, 317 Ga. at 133 (holding that where the "State never argued that [the defendant] should have retreated" and where certain evidence on which the defendant relied did not "amount[ ] to an argument—or even ask[ ] the jury to infer—that [the defendant] should have retreated," "the trial court did not commit any obvious error by not giving a no-duty-to-retreat instruction"); *White*, 291 Ga. at 9 (holding that, under plain-error review, the defendant failed to carry his burden to show that the trial court erred in failing to charge on the principles of retreat because that issue was "not raised by the evidence so as to support the giving of a charge on the subject" where "the defendant testified and was not questioned as to why he did not leave the scene"); *Higginbotham v. State*, 287 Ga. 187, 190 (695 SE2d 210) (2010) (rejecting the defendant's argument that the trial court committed plain error by failing to charge on the principles of retreat where "the issue of retreat on [the defendant's] part was not raised by the evidence," as the defendant "was not

26

questioned as to why he did not leave the scene").

*Judgment affirmed. All the Justices concur, except Warren, J., who concurs in judgment only as to Division 2 (b), and LaGrua, J., disqualified.*

Decided October 15, 2024.

Murder. Fulton Superior Court. Before Judge Eaton.

*Zell & Zell, Rodney S. Zell*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Pareesa H. Amjadi, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Michael A. Oldham, Clint C. Malcolm, Senior Assistant Attorneys General*, for appellee.