NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 6, 2025

S25A0355.  COLEMAN v. THE STATE.

MCMILLIAN, Justice.

Amanda Coleman appeals her malice murder conviction for the death of two-year-old Brooklyn Aldridge.[1] Coleman argues that (1) the trial court erred in admitting evidence of her methamphetamine use; (2) the trial court erred in excluding her expert's testimony about alternative causes of death; and (3) trial counsel rendered constitutionally ineffective assistance by failing to object to the

---

[1] Brooklyn died on March 6, 2018. In August 2018, a Coffee County grand jury indicted Coleman for malice murder and felony murder. At a jury trial held in October 2019, Coleman was found guilty of both counts. The trial court sentenced Coleman to serve life in prison without the possibility of parole for malice murder; although the trial court purported to merge the felony murder count for sentencing purposes, it was actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-72 (434 SE2d 479) (1993). Coleman timely filed a motion for new trial, which was amended through new counsel on April 25, 2024. Following a hearing, the trial court denied the motion for new trial, as amended, on July 26, 2024. Coleman timely appealed, and her case was docketed to the term of this Court beginning in December 2024 and submitted for a decision on the briefs.

prosecutor's allegedly improper characterization of reasonable doubt during closing argument. Because we conclude that evidence of Coleman's methamphetamine use was admissible; that the trial court did not plainly err in limiting the defense expert's testimony; and that Coleman cannot show prejudice from trial counsel's failure to object during closing argument, we affirm.

The evidence at trial showed that Brooklyn was born in January 2016 and lived almost exclusively with her biological mother, Rachel Aldridge, until a March 1, 2018 court order required that Brooklyn alternate weeks living with Aldridge and Brooklyn's biological father, Ron Lott. At that time, Lott lived with Coleman, along with their one-year-old son, and Coleman's three children from a prior relationship. Lott worked outside of the home, and Coleman stayed home with the children.

Aldridge testified that in the days leading up to Brooklyn's death, Brooklyn was walking, talking, and eating as usual. Neither Aldridge nor Aldridge's sister, who is a registered nurse, saw anything unusual happen to Brooklyn while she was with them over

2

the weekend. The preschool director at Brooklyn's church testified that Brooklyn was "happy, healthy, smiling, playing and enjoying her friends" in the nursery that Sunday morning and did not show any signs of sickness. When Aldridge dropped Brooklyn off at Lott's home around 6:00 p.m. on Sunday, March 4, 2018, Aldridge mentioned that Brooklyn had thrown up a few days ago after eating too much pizza.

The next morning, while Lott was making breakfast, Brooklyn came in and told him that she was hungry. Brooklyn ate breakfast and then played with her siblings. On Tuesday, March 6, Lott took Coleman's two older sons, A. C. and J. C., to the bus stop and then went to work. A. C., who was nine years old at the time, testified that he checked on Brooklyn and his younger siblings before going to school that morning. He noticed that Brooklyn seemed "sad" but thought it "was just because she had to leave her mom's house." Coleman stayed home with Brooklyn and her two younger children the rest of the day. When Lott came home for lunch, Coleman told him that Brooklyn was not feeling well and that he should be quiet

so Brooklyn could sleep. After Lott returned to work, he and Coleman texted several times, and Coleman reported that Brooklyn was still not feeling well.

When the boys came home from school, Coleman told them to be quiet because Brooklyn was sleeping. Around 5:30 p.m. that evening, Lott's mother, Glendora, and Glendora's sister stopped by the house unannounced to visit the children. Coleman was lying down on the couch and said that Brooklyn had been sick. Coleman then went to check on Brooklyn and "hollered" for help. Glendora rushed into the room and immediately called 911 before beginning CPR. Brooklyn had thrown up and had vomit in her mouth and hair. Her eyes were open, and her body was cold. Paramedics arrived at 6:02 p.m. and found Brooklyn lifeless; she was pale with fixed eyes, was not breathing, and had no pulse.

Coleman told responding officers that Brooklyn had not "been acting herself all day," that "she was acting like she was sleepy," and that she "had been throwing up." Coleman claimed that she laid Brooklyn down at 4:00 p.m. and that when she went to check on her

4

a little before 6:00 p.m., she noticed Brooklyn "was not breathing, she was cold, and she was blue." Later that evening, Coleman told a GBI investigator that she fed Brooklyn a light meal before she laid her down around lunch time; she stayed with Brooklyn until she fell asleep and then Coleman went to sleep in another room until her sons came home from school around 3:00 p.m. At that point, she checked on Brooklyn, who was snoring.

The following day, investigators from Georgia's Division of Family & Children Services ("DFCS") came to the home. Lott took a urine test at their request, and his urine tested negative for the presence of drugs. DFCS investigators also asked Coleman to take a urine test, and she initially refused. After the lead DFCS investigator explained the importance of taking the test, Coleman agreed, and the test was positive for the presence of methamphetamines. Coleman and Lott then spoke privately, and Coleman told Lott that she had "slipped up a few times" with drugs since November but that she had not used drugs in the week or two before Brooklyn's death. Lott testified that he was not aware that

5

Coleman had starting using drugs again, but he knew that Coleman would sometimes leave in the middle of the night while he and the children were sleeping, claiming that she was going to run errands.

The lead DFCS investigator testified that Coleman asked to speak with her privately and then told her that she had "f**ked up" and "had been using meth" but only "at night when [the children] were asleep." Coleman claimed that her last use "was about a month prior." Coleman later told another DFCS employee that she had relapsed with methamphetamine because she was "stressed out and overwhelmed" as the children's primary caretaker.

The medical examiner who performed the autopsy on Brooklyn identified a large subdural hemorrhage that caused Brooklyn's brain to swell and herniate through the base of her skull, damaging her brain stem and causing her death. The subdural hemorrhage was still liquid, meaning that Brooklyn had not lived long enough after the injury for her body to try to heal itself. The medical examiner attributed Brooklyn's cause of death to blunt force impact and opined that the significant force required to cause the injury could

not have been inflicted by Brooklyn or another toddler or a fall off a bed. Rather, it would have been caused by a hard, immovable object striking her head. The medical examiner explained that Brooklyn would have displayed a noticeable decrease in her level of consciousness very soon after the injury and would not have been able to walk or talk normally.

As part of her defense, Coleman presented the expert testimony of Dr. Adel Shaker, a medical examiner, who testified that Brooklyn's injury would be consistent with several hypothetical accidents, including her having fallen off the family's trampoline, jumping on and falling off a bed, or slipping in a bathtub within the 72 hours leading up to her death.

1. Coleman asserts that the trial court erred in admitting evidence of her methamphetamine use for several reasons. We are not persuaded.

Before trial, Coleman moved in limine to exclude evidence of her drug use, arguing first that it was inadmissible under OCGA §

7

24-4-403[2] ("Rule 403") and OCGA § 24-4-404 (b)[3] ("Rule 404 (b)") and also that the result of the urine test was inadmissible because it lacked scientific reliability. The trial court denied the motion after concluding that evidence of Coleman's drug use was intrinsic evidence and therefore not subject to the limitations set forth in Rule 404 (b) and also satisfied Rule 403's balancing test. The trial court then addressed Coleman's challenge to the admissibility of the urine test based on the test's alleged lack of scientific reliability and ruled that the State would be permitted to introduce evidence showing

[2] This statute provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[3] This statute provides:

Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The prosecution in a criminal proceeding shall provide reasonable notice to the defense in advance of trial, unless pretrial notice is excused by the court upon good cause shown, of the general nature of any such evidence it intends to introduce at trial. Notice shall not be required when the evidence of prior crimes, wrongs, or acts is offered to prove the circumstances immediately surrounding the charged crime, motive, or prior difficulties between the accused and the alleged victim.

8

Coleman took a test that was indicative of the presence of methamphetamines.[4] Coleman made a continuing objection to the results of the urine test pursuant to *Harper v. State*, 249 Ga. 519 (292 SE2d 389) (1982) (setting out standard for admission of expert testimony in criminal cases tried before July 1, 2022, when it was superseded by statute).[5]

(a) *Rule 404 (b)*

Although Rule 404 (b) limits the admission of evidence of other crimes, wrongs, or acts, those limitations do not apply to intrinsic evidence. See *Roberts v. State*, 315 Ga. 229, 235-36 (2) (a) (880 SE2d 501) (2022). Evidence of other crimes is considered intrinsic if it is "(1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to

---

[4] The parties agreed that evidence of a subsequent hair follicle test was inadmissible.

[5] Under *Harper,* a trial court in a criminal case was tasked with "decid[ing] whether the procedure or technique in question [had] reached a scientific stage of verifiable certainty, or . . . whether the procedure rest[ed] upon the laws of nature." 246 Ga. at 525 (1) (cleaned up). This case was tried in 2019, before the amendment of OCGA § 24-7-702, which extended the federal standard of admissibility of expert testimony articulated in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (113 SCt 2786, 125 LE2d 469) (1993), to criminal cases.

complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense." Id. at 236 (2) (a) (citation and punctuation omitted). We have also defined evidence as intrinsic "if it pertains to the chain of events explaining the context, motive, and set-up of the crime and is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime." *Jackson v. State*, 317 Ga. 95, 101 (2) (a) (891 SE2d 866) (2023) (citation and punctuation omitted). "We review a trial court's ruling regarding the admissibility of evidence as intrinsic for an abuse of discretion." *State v. Harris*, 316 Ga. 272, 277 (3) (888 SE2d 50) (2023).

Applying this standard here, we conclude that the trial court did not abuse its discretion in admitting as intrinsic evidence that Coleman had used methamphetamine in the weeks leading up to Brooklyn's death. Coleman, who was the only adult present on the day that Brooklyn died, admitted that she had been using methamphetamine because she was "stressed out and overwhelmed" as the children's primary caregiver. And in her

10

various pretrial statements, Coleman admitted that she had been using methamphetamine in the middle of the night, which would also help explain why Coleman was found sleeping in the afternoon when Glendora arrived and Brooklyn was found deceased. Thus, Coleman's methamphetamine use was linked in time and circumstance to the charged crimes and helped to explain the context for the crimes. See, e.g., *McNabb v. State*, 313 Ga. 701, 713 (2) (a) (872 SE2d 251) (2020) (explaining, in the context of an ineffective assistance of counsel claim, that evidence of defendant's drug use and physical abuse would have been admissible as intrinsic evidence in circumstantial case involving death of infant); *Smith v. State*, 302 Ga. 717, 725-26 (4) (808 SE2d 661) (2017) (portions of defendant's statement that referred to his drug use were properly admitted as intrinsic evidence because they "formed an integral and natural part of his account of the circumstances surrounding the offenses for which he was indicted").

(b) *Rule 403*

Although intrinsic evidence must still satisfy Rule 403's

balancing test, see *Jackson*, 317 Ga. at 102 (2) (a), "[t]he exclusion of relevant evidence under Rule 403 is an extraordinary remedy that trial courts should grant only sparingly." *Smith v. State*, 307 Ga. 263, 273 (2) (c) (834 SE2d 1) (2019) ("The major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." (citation and punctuation omitted)). As we have explained, "[i]nculpatory evidence is inherently prejudicial," and such prejudicial effect does not automatically render evidence inadmissible as *unfairly* prejudicial. *Jackson*, 317 Ga. at 102 (2) (a) (citation and punctuation omitted). Rather, "[t]he prejudicial effect of evidence is unfair if the evidence has the capacity to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged, or an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Id. (citation and punctuation omitted). "[I]n reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue

prejudicial impact." *Mills v. State*, 320 Ga. 457, 464-65 (3) (b) (910 SE2d 143) (2024) (citation and punctuation omitted).

Here, given Coleman's own admissions, the probative value of evidence that Coleman was using methamphetamine because she was "stressed out and overwhelmed" by her caregiver role was relatively high in explaining Brooklyn's sudden death while in Coleman's sole care, and it is not likely that the jury improperly convicted Coleman based solely on evidence of her previous methamphetamine use. Because any unfair prejudice from this evidence did not substantially outweigh its probative value, the trial court did not abuse its discretion in admitting this evidence under Rule 403. See *Wilson v. State*, 315 Ga. 728, 740 (8) (a) (883 SE2d 802) (2023) (although evidence may have cast defendant "in an unflattering light, it did not do so *unfairly*" (emphasis in original)); *Whited v. State*, 315 Ga. 598, 605 (3) (883 SE2d 342) (2023) (evidence of defendant's perceived disregard for his daughter's well-being was relevant to the question of his intent toward her on the day she sustained her fatal injuries and not unfairly prejudicial).

(c) *Reliability Challenge*

Coleman also argues that the result of the urine test was inadmissible without expert testimony establishing the scientific reliability of the specific testing method.[6] See *Harper*, 249 Ga. 519. However, pretermitting whether the trial court abused its discretion in admitting evidence of the positive urine test result, it was clearly cumulative of Coleman's multiple statements to other witnesses that she had been using methamphetamine in the weeks before Brooklyn's death. Accordingly, any error was harmless. See *Lyons v. State*, 309 Ga. 15, 22 (4) (843 SE2d 825) (2020) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. Generally, the erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is

---

[6] At trial, a DFCS contractor, who was trained by Quest Diagnostics certified staff and who conducted Coleman's urine test, explained that she provides an "instant cup" for an individual to urinate in, after which she rips a label off, and lines come back showing the results of the screen. On cross-examination, the defense highlighted that the urine test results were not sent for confirmation testing.

introduced." (cleaned up)).

(d) *Constitutional Challenge*

Coleman argues for the first time on appeal that the trial court abused its discretion in admitting evidence of her initial refusal to submit to drug testing under *Awad v. State*, 313 Ga. 99, 103 (3) (868 SE2d 219) (2022) (holding that the right against compelled self-incrimination protected by Article I, Section I, Paragraph XVI of the Georgia Constitution prohibits the State from admitting into evidence a defendant's refusal to submit to a urine test that would have required the defendant to urinate into a collection container). Because she did not raise this specific ground in the trial court, we review this claim only for plain error. See *Dunbar v. State*, 309 Ga. 252, 256 (3) (845 SE2d 607) (2020) ("Because she did not object to the trial court on the constitutional grounds she now raises, we review this evidentiary claim only for plain error."). To establish plain error, Coleman must show "(1) the alleged error was not affirmatively waived, (2) it was obvious beyond reasonable dispute, and (3) it affected [her] substantial rights, which ordinarily means

15

showing that it affected the outcome of the trial." *Rana v. State*, 320 Ga. 66, 74 (4) (907 SE2d 674) (2024) (citation and punctuation omitted). If an appellant meets all three prongs of this test, this Court "has the discretion to remedy the error only if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." Id. (citation and punctuation omitted).

As an initial matter, we question whether it is clear and obvious beyond reasonable dispute that evidence of Coleman's initial refusal to submit to the urine test is inadmissible under *Awad*, which did not involve a situation where the defendant voluntarily submitted to the urine test later that same day, and Coleman points to no precedent holding that an initial refusal to submit to a urine test is inadmissible under these circumstances. However, even assuming that it was clear and obvious error to admit evidence about Coleman's initial refusal, Coleman subsequently submitted to the test, and the positive result from that test was cumulative of her own voluntary admissions of methamphetamine use to both Lott and DFCS investigators. Thus, even if Coleman could satisfy the

16

second prong of the plain-error test, she cannot show that any error in the admission of her initial refusal affected the outcome of her trial. See *Rogers v. State*, 311 Ga. 634, 639 (2) (859 SE2d 92) (2021) (plain error claim failed where challenged evidence was cumulative of other properly admitted evidence).

2. Coleman also argues that the trial court abused its discretion in limiting her expert witness's testimony about alternative causes of Brooklyn's death, which allegedly undermined her "constitutional right" to present a complete defense. We disagree.

Prior to the start of trial, the State moved in limine to exclude portions of Dr. Shaker's testimony. Coleman argued that Dr. Shaker would testify that Brooklyn had pneumonia that could have led to disseminated intravascular coagulopathy (DIC), and, therefore, it could have taken less blunt force to cause harm to her, such that an accidental fall could have caused Brooklyn's death.[7] After the trial

---

[7] In his report, Dr. Shaker noted that despite documentation of her lung tissue showing consistencies with pneumonia, he had not seen further testing that would exclude or preclude bacteremia or septicemia that could have led to DIC, which could have led to easy bruising and bleeding in the head.

17

court expressed concern over Dr. Shaker's speculation as to the exact source of the blunt force injury without any evidence to support it, the parties agreed that Dr. Shaker could simply say that the injury could have resulted accidentally.[8] The trial court then preliminarily ruled that it would exclude Dr. Shaker's speculative opinions regarding pneumonia and DIC as potential alternative explanations for Brooklyn's injuries but agreed to revisit the issue.

After the State rested its case at trial, a proffer was made in which Dr. Shaker explained that he found "fingerprints" of pneumonia based on the autopsy report. Dr. Shaker conceded, however, that he could not exclude or prove bacteremia or septicemia that could have led to DIC. The trial court concluded that, because Dr. Shaker did not have enough information to say that pneumonia caused Brooklyn to develop DIC, it was not appropriate for Dr. Shaker to speculate and upheld its prior ruling excluding this line of testimony regarding pneumonia and DIC.

---

[8] The trial court announced, "But he can . . . say . . . this could have happened accidentally." Coleman's lead counsel responded, "That's what we want."

After the trial court reiterated that Dr. Shaker would be permitted to testify that there could have been an accidental trauma to Brooklyn, defense counsel stated, "Good enough." And as the trial court allowed counsel to explore the parameters of its ruling during the bench conference, defense counsel three more times responded, "Good enough." Dr. Shaker then testified before the jury that Brooklyn's injury would be consistent with several hypothetical accidents, including her having fallen off the family's trampoline, jumping on and falling off a bed, or slipping in a bathtub within the 72 hours leading up to her death.

Because Coleman did not raise any constitutional challenge to the trial court's ruling limiting Dr. Shaker's testimony, this claim is reviewed for plain error only. See *Dunbar*, 309 Ga. at 256 (3). Assuming without deciding that Coleman has not affirmatively waived this claim of error, Coleman cannot show that the outcome would have been different had Dr. Shaker been permitted to testify that Brooklyn may have had pneumonia that may have caused DIC, which may have exacerbated the blunt force trauma injury while

19

Brooklyn was in Coleman's sole care. Evidence was presented that Brooklyn had thrown up a few days before she was dropped off at her father's house, suggesting that she was unwell. And Dr. Shaker was allowed to testify that Brooklyn's death may have been caused by some accidental blunt force trauma the weekend before she was dropped off at her father's house. Yet the jury rejected this theory in finding Coleman guilty of malice murder. Thus, it is unlikely that additional testimony about how Brooklyn may have bled more easily due to DIC would have made any material difference to the jury's apparent rejection of the theory that Brooklyn's injury was caused accidentally, particularly given the State's evidence that Brooklyn's blunt force injury was caused by "significant violent force," rather than an accidental fall off a bed, that her injuries would have been noticeable "very quickly," and that Coleman admitted to methamphetamine use in the weeks leading up to Brooklyn's death. Accordingly, this enumeration of error fails. See *Merritt v. State*, 311 Ga. 875, 886 (4) (860 SE2d 455) (2021) (appellant unable to show that the trial court committed plain error because he could not

demonstrate that the outcome of his trial probably would have been different had his expert witness been allowed to testify at trial).

3. Coleman also asserts that trial counsel provided constitutionally ineffective assistance by failing to object to the prosecutor's improper characterization of the reasonable doubt standard during closing argument. We disagree.

To prevail on this claim, Coleman must show both that her counsel performed deficiently and that she suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Coleman must show that her attorney's acts or omissions were "objectively unreasonable . . . considering all the circumstances and in the light of prevailing professional norms." *Davis v. State*, 299 Ga. 180, 182-83 (2) (787 SE2d 221) (2016). To carry her burden of overcoming the "strong presumption that counsel performed reasonably," Coleman must show that "no reasonable lawyer would have done what [her] lawyer did, or would have failed to do what [her] lawyer did not." *Washington v. State*, 313 Ga. 771, 773 (3) (873

21

SE2d 132) (2022) (citation and punctuation omitted). To prove prejudice, Coleman must demonstrate that there is a reasonable probability that, but for her counsel's deficient performance, the result of the trial would have been different. See *Davis*, 299 Ga. at 183 (2). When an appellant fails to make a sufficient showing on one part of this test, we need not address the other part. See *Washington*, 313 Ga. at 773 (3).

During closing arguments, the prosecutor reiterated that the State had the burden of proving beyond a reasonable doubt that Coleman committed the charged offenses. The prosecutor then argued:

> The Judge is going to tell you, we don't have to prove it to a mathematical certainty, to a scientific fact, beyond all doubt. It's to a reasonable doubt. That is a reason you can assign to the doubt. If you can't assign that reason, then you know she's guilty. The other thing that from time to time I hear jurors say is they go back to the room and they're thinking about it and they come out and they say, we think she was guilty but. If you go back there and you say — *your mind says we think she was guilty, then you have been convinced beyond a reasonable doubt.* The "but" part is you wanting certainty. You want something that's not required. The law does not require certainty, but a doubt that you can assign a reason to. If that doubt does

22

not exist, then you should convict her.

(Emphasis supplied.)

When asked about it, counsel did not recall the challenged portion at the motion for new trial hearing, but he did not believe it was objectionable and agreed that the trial court would have explained to the jurors that they had to find Coleman guilty beyond a reasonable doubt and would have explained that opening statements and closing arguments are not evidence.[9]

We first note that prosecutors are generally afforded "wide latitude during closing arguments." *Burke v. State*, 320 Ga. 706, 711 (2) (d) (911 SE2d 575) (2025). And here, the record shows that, when viewed in context, the prosecutor was discussing the difference between certainty and reasonable doubt without attempting to reduce or shift the burden to Coleman or to reduce the concept of reasonable doubt to a percentage. See id. at 711 (2) (d) ("Considered in their full context, the remarks here fell within the wide latitude

---

[9] The trial court did give the pattern charges on Coleman's presumption of innocence, the State's burden of proof, reasonable doubt, and that opening or closing remarks by the attorneys did not constitute evidence.

23

given to prosecutors during closing argument and did not shift the burden of proving any fact to [appellant]." (citation and punctuation omitted)); *Jackson v. State*, 319 Ga. 51, 55 (2) (901 SE2d 552) (2024) (in addition to making the challenged statement, the prosecutor correctly characterized reasonable doubt as not requiring a mathematical certainty); *Debelbot v. State*, 308 Ga. 165, 167 (839 SE2d 513) (2020) ("[T]he argument that proof beyond a reasonable doubt requires something less than proof that leaves a jury with 51 percent certainty is obviously wrong." (cleaned up)).

However, pretermitting whether counsel was deficient in failing to object, Coleman has not established prejudice because the trial court properly charged the jury on presumption of innocence, burden of proof, and the correct standard for reasonable doubt, and the challenged statements from the prosecutor were fleeting and were only made one time in the course of the argument. Accordingly, this ineffective assistance claim fails. See *Jackson*, 319 Ga. at 55 (2) (ineffective assistance claim failed where appellant did not show reasonable probability that counsel's failure to object to the

24

prosecutor's statements affected the outcome of his trial); *Troutman v. State*, 320 Ga. 489, 500 (3) (d) (910 SE2d 173) (2024) (where trial court instructed jury on burden of proof, presumption of innocence, and reasonable doubt and also told jury that closing arguments were not evidence, appellant failed to show how counsel objecting to prosecutor's comments would have created a reasonable probability of a different outcome).

4. Lastly, we note that, although Coleman has not made a cumulative-error argument, we determine that the combined prejudicial effect from any error presumed in the admission of Coleman's initial refusal to take the urine test and in trial counsel's failure to object to the prosecutor's closing argument would not demand a new trial. See *Haufler v. State*, 315 Ga. 712, 722 (2) n.14 (884 SE2d 310) (2023) (conducting cumulative-error review even though appellant did not argue cumulative error and concluding that appellant failed to establish that the combined prejudicial effect of the errors required a new trial).

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel,*

*Ellington, LaGrua, Colvin, and Pinson, JJ, concur.*